UNITED STATES of America,
Plaintiff-Appellee,

v.

Phillip Kent PALMER, Joseph Philip Silverman, Ernest Smith, Freddie Daniel Milton, Edward Earl Dillingham and Wayne Franklin Dean, Defendants-Appellants.

No. 73–1717.

United States Court of Appeals,
Fifth Circuit.

Oct. 2, 1974.

**1234**

Michael N. Mantegna, Atlanta, Ga. (Court-appointed), for Palmer.

Gaines C. Granade, Atlanta, Ga., for Silverman.

Hugh Nations, Atlanta, Ga. (Court-appointed), for Smith and Milton.

William R. Gignilliat, III, Atlanta, Ga. (Court-appointed), for Dillingham.

John C. Pennington, Atlanta, Ga. (Court-appointed), for Dean.

Eugene A. Medori, Jr., Asst. U. S. Atty., John W. Stokes, Jr., U. S. Atty., Anthony M. Arnold, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

1. In violation of the Dyer Act, 18 U.S.C. §§ 2312 and 2313, as well as the general federal conspiracy statute, 18 U.S.C. § 371.

2. We, therefore, affirm under Local Rule 21 as to the rest. See N.L.R.B. v. Amalgamated Clothing Workers of America, 430 F.2d 966 (5th Cir. 1970).

Before TUTTLE, WISDOM and GEE, Circuit Judges.

GEE, Circuit Judge:

The six appellants were found guilty by a jury under various counts of a fifteen-count indictment for their respective roles in an interstate automobile theft ring.[1] Each comes to us with several points on appeal, none of which requires reversal. Indeed, after considering all contentions we have concluded that our opinion on only one point of law raised by one appellant would have precedential value.[2]

### Appellant Dillingham's right to a speedy trial

Edward Earl Dillingham was convicted on all fifteen counts. The evidence shows that he was instrumental in organizing the conspiracy, in promoting the thefts of the cars, and in effectuating their subsequent sale—principally through his crucial role in obtaining fraudulent title documents.

Dillingham was arrested on April 6, 1970, on a warrant charging a violation of the Dyer Act. On May 28, 1970, he was released on a $1,500 bond. He was indicted along with fifteen other defendants on February 9, 1972, by a federal grand jury in the Northern District of Georgia. He was arraigned on October 20, 1972, brought to trial on January 22, 1973, and found guilty by a jury verdict on February 2, 1973.

1. Post-arrest pre-indictment delay.

Dillingham's most serious complaint is that the 22-month delay between his initial arrest, from which he was released on bond, and his indictment violated his Sixth Amendment right to speedy trial and his Fifth Amendment right to due process.[3]

3. Because we conclude that the discretion given the District Court by Federal Rule of Criminal Procedure 48(b) to dismiss an indictment if there is unnecessary prosecutorial delay does not *compel* dismissal if constitutional requirements are satisfied, we need not treat separately his contention that the court below erred in not exercising its Rule 48(b) power.

He argues that the delay should be evaluated according to the *ad hoc* standard discussed by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Our reply must be the same as in United States v. Smith, 487 F.2d 175 (5th Cir. 1973):

> The contention of appellant is that approximately three and one half years elapsed between the time he came to be in federal custody and the time he was indicted for the above-mentioned offenses and such pre-indictment delay is in violation of his constitutional right to a speedy trial. Although appellant urges upon this court the test espoused by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1973), we find that test not to be applicable in this case. Here we are faced with a pre-indictment delay which, according to the Supreme Court, is not to be counted for the purposes of a Sixth Amendment motion absent a showing of actual prejudice. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), Hoskins v. Wainwright (5 Cir. 1973), 485 F.2d 1186. Therefore, the only question facing this court is whether actual prejudice did occur.

487 F.2d at 177.

We most recently ruled on the subject of post-arrest pre-indictment delay in United States v. Zane, 489 F.2d 269 (5th Cir. 1973). There Chief Judge Brown preserved the distinction which we made in United States v. Smith between the broad Barker v. Wingo test applicable to post-indictment delay and the more narrow United States v. Marion test applicable to pre-indictment delay. As stated by Judge Brown:

> While post-arrest pre-indictment delay is within the scope of the speedy trial guarantee, a substantial showing of actual prejudice is required to establish a Sixth Amendment violation in this situation.

489 F.2d at 270.

■ Therefore, in applying the Sixth Amendment to a post-arrest pre-indictment situation, our attention is focused on "actual prejudice"—and only peripherally on such factors as length of and reason for the delay. Also, in order for the Sixth Amendment protection to apply there need not be a finding that the prosecutorial delay was intentionally employed to disadvantage the defense. We have interpreted the Supreme Court's language in *Marion*, 404 U.S. at 324, 92 S.Ct. 455, to mean that the Fifth Amendment is concerned with intent. See United States v. Zane, 489 F.2d at 270. But, since here no contention or indication of prosecutorial intent to prejudice exists, we have no occasion to apply the Fifth Amendment beyond its overlap with the Sixth.[4]

Subsequent to trial, a hearing was held on Dillingham's motion to dismiss his indictment[5] at which he was given the opportunity to show that the delay caused him substantial actual prejudice. This he was unable to do to the satisfaction of the trial court; and, upon reviewing the transcript of the hearing, we agree with that decision.

■ We do not review the evidence with a narrow concept of what constitutes "actual prejudice." Certainly, as pointed out in United States v. Smith,

---

4. Whether the Fifth Amendment due process protection applies to *pre*-arrest pre-indictment delay *only* if the substantial actual prejudice is caused by prosecutorial delay intentionally employed we are not called upon to decide. We do hold that the delay need not have been intentional in order for it to offend the Sixth Amendment in a post-arrest pre-indictment situation. Also, whether a showing that the delay was intentional could tip the Sixth Amendment scales in a pre-indictment situation, as it can in a Barker v. Wingo post-indictment situation, we need not decide—since every indication is that this delay was bureaucratic, not intentional, and Dillingham does not claim otherwise.

5. The only possible remedy when a defendant has been denied a speedy trial. Strunk v. United States, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

487 F.2d 175, 177 (5th Cir. 1973), the term includes impairment of the defendant's capacity to prepare a defense—because, for example, of failure of memories or loss of records or disappearance of witnesses.[6] But, perhaps even more importantly, the term encompasses what we label *personal* prejudice as distinguished from prejudice to the defense. The adversities which follow an arrest were of uppermost concern to the Supreme Court in *Marion*.

> Inordinate delay between arrest, indictment, and trial may impair a defendant's ability to present an effective defense. But the major evils protected against by the speedy trial guarantee exist quite apart from actual or possible prejudice to an accused's defense. To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime. Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.

404 U.S. at 320, 92 S.Ct. at 463.

Therefore, in our review of the record we have weighed Dillingham's evidence of personal hardship along with that of damage to his defense in determining whether "substantial actual prejudice" was shown. We conclude that it was not.

Dillingham offered two witnesses, Mr. William Rogers and Mrs. Barbara Bennett, who were employees of Frank Vego Ford during the time he worked there and while he was making out-of-state runs for the stolen cars and obtaining title documents for them. They were called to prove the existence, but loss following Dillingham's arrest, of records from Vego Ford which he viewed as exculpatory: (1) Attendance records which would have reflected his presence on the job on days the government charged he was off on conspiratorial business, and (2) some indication of his power of attorney to obtain titles for cars sold by his employer.

At the outset, we note that Vego Ford went out of business in February or March of 1970 and Dillingham was arrested in April of 1970. Therefore, any records which vanished with shut-down of business were probably unavailable either before or soon after his arrest. Our only indication of their whereabouts comes from Mrs. Bennett's testimony that they were "in storage" as far as she knew. Dillingham offered no testimony that he tried to locate these records at any time and gave no indication that such efforts would have stood more chance of success before indictment than after.[7]

Mr. Rogers was new car sales manager during part of the time that Dillingham was a new car salesman. When called as Dillingham's first witness, he testified that he left Vego Ford in October of 1969. According to the prosecution, the only times Dillingham's conspiratorial business took him out of town were in December of 1969 and January of 1970. Also, the first theft did not occur until October 26, 1969. Thus Mr. Rogers was definitely not present on the days Dillingham was allegedly absent from work and was quite possibly not working at Vego Ford when the first overt act took place. Therefore, he made a poor witness to testify about Dillingham's presence on the job. Moreover, Rogers' testimony was essentially that Vego Ford's role-keeping and time records would not conclusively show that

---

6. Detriments which may also befall the prosecution and which emphasize *society's* interest in speedy trial for the accused. See Barker v. Wingo, 407 U.S. 514, 519–521, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) ; Dickey v. Florida, 398 U.S. 30, 42, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring).

7. With his indictment, he was sufficiently put on notice of the advisability of locating any such exculpatory documents.

a particular car salesman was physically present at Vego Ford during the course of any particular day.

Mrs. Bennett, Dillingham's second witness, was office manager in charge of bookkeeping at Vego Ford during the relevant period of his employment. She testified that Dillingham did not have authority from Vego Ford, in the form of power of attorney, to pick up titles from the State of Georgia. She added that new car titles were mailed out, and that if Dillingham ever picked up a title to a used car it was done as a private favor to a customer and not for Vego Ford. This testimony hardly substantiates Dillingham's assertion that records reflecting his power of attorney existed and were lost during the period of delay. Also, it is not at all clear how evidence that he had such powers of attorney as he claimed would have refuted the government's charge that he obtained fraudulent title documents for stolen cars.

■ Indeed, the trial court observed at the close of the hearing: (1) That there was no showing that if such records existed they would have been available to Dillingham if he had tried to obtain them at the earliest possible opportunity; (2) that there was no showing that Dillingham made any effort at any time to secure such records as might help his case; (3) that any attendance records showing Dillingham's presence in the Atlanta vicinity would be compatible with his guilt; (4) that the State had no record of the claimed general power of attorney as it would have had it been in existence; and (5) that any power of attorney from Vego Ford would have been consistent with the finding that Dillingham participated in securing fraudulent titles for stolen vehicles. Since we are in complete agreement with these findings, we cannot say that the delay to any substantial degree prejudiced Dillingham's defense.

■ Turning to the area of *personal* prejudice, Dillingham argued that he underwent severe personal hardships while living under the "Sword of Damocles." He testified in his own behalf that his reputation was so damaged by his arrest that he was unable to keep a job, that the pendency of these federal charges caused his wife to file for divorce and him to be separated from his children, and that his health, friendships, and credit rating suffered. However, the trial court's express finding that Dillingham's uncorroborated testimony concerning these personal hardships was not credible causes us to take a skeptical view. Dillingham admitted an Army court martial and a recent conviction for larceny which, if known to prospective employers or business associates, would have hindered his ability to earn a living. Also, he testified that State charges growing out of the car theft ring contributed to his difficulty in holding a job. Thus, the pending Federal charges were merely cumulative to his otherwise bad record. We, therefore, conclude that any increased strain on this man's life which followed his arrest on these Federal charges does not rise to the level of substantial actual prejudice.

2. Post-indictment pre-trial delay.

■ Dillingham also complains that the government denied his Sixth Amendment right to speedy trial in failing to arraign him until over eight months after his indictment and in not bringing him to trial for three more months. This *post*-indictment delay we evaluate according to the *ad hoc* approach required by Barker v. Wingo, guided by the four basic factors therein identified: (1) The length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the defense. We also keep in mind such considerations as the gravity of the offense, the likelihood of repetition, the number and complexity of legal and factual issues involved, the availability of evidence, and all other relevant circumstances. See United States v. Perez, 489 F.2d 51 (5th Cir. 1973); United States v. Dyson, 469 F.2d 735, 739 (5th Cir. 1972).

Dillingham was indicted on February 9, 1972. He testified that he had no notice of his indictment until September 18, 1972, when he was arrested on a bench warrant in Columbia, South Carolina. He was arraigned on October 20, 1972. On October 30, 1972, he filed his first motion to dismiss the indictment on grounds of denial of speedy trial because of the 22-month *pre*-indictment delay. On December 7, 1972, the district court denied the motion without prejudice to his right to move for acquittal at trial. He was brought to trial on January 22, 1973, and was convicted on February 2, 1973.

Prosecution witnesses testified that the lapse of over seven months between Dillingham's indictment and arrest was caused by their inability to locate him owing to his moving about without leaving a forwarding address or keeping even his relatives advised of his whereabouts. He was finally tracked down at work through his Social Security number. Dillingham's testimony gives no indication that he or his attorney made any efforts to stay in touch with Federal authorities. He did testify, however, that, as far as he knew, the government made no attempt to notify his attorney of his indictment. In this context, we believe that part of the blame for this delay must be attributed to the same bureaucratic unwieldiness which caused the pre-indictment delay. However, we also give credence to the district court's conclusion that the complexities of the case necessarily showed down the prosecutorial functions. Sifting these explanations, we are not entirely satisfied that the government moved as rapidly as it could have following the indictment; but, under these circumstances, a clear showing of substantial prejudice would be required to tip the scales in Dillingham's favor.

■ We do not find serious fault with Dillingham's failure to assert his right to speedy trial until notified of his indictment. But the motion which he filed following his arraignment referred only to *pre*-indictment delay. Even so, trial followed within three months of his arraignment and motion. This three-month period we consider to be so short as to necessitate no discussion of the unavoidable personal inconveniences which occurred then.

Therefore, the crucial factor again becomes the prejudice suffered by Dillingham while, unbeknownst to him, he was under indictment. Neither the transcript of the trial nor that of the post-trial hearing reveals any more substantial prejudice suffered during this post-indictment period than during the previous 22-month pre-indictment period. Indeed, it appears as an uninterrupted period in which Dillingham shifted about, tried to earn a living burdened by an already bad record, but made no efforts to locate exculpatory evidence. Under all these circumstances, we conclude that Dillingham's right to speedy trial was not violated by either the pre or post indictment delay.

As indicated at the outset of this opinion, we affirm the convictions of all appellants on all counts.

Affirmed.