**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jerry Eugene GRAVITT, Defendant-
Appellant.**

**No. 72–3163.**

United States Court of Appeals,
Fifth Circuit.

Aug. 30, 1973.

Certiorari Denied Jan. 7, 1974.
See 94 S.Ct. 879.

John E. Roberts, Marianna, Fla. (Court-appointed), for defendant-appellant.

William H. Stafford, Jr., U. S. Atty., Pensacola, Fla., Clinton Ashmore, Asst. U. S. Atty., Tallahassee, Fla., Robert L. Crongeyer, Jr., Asst. U. S. Atty., Pensacola, Fla., for plaintiff-appellee.

Before WISDOM, DYER and IN-GRAHAM, Circuit Judges.

WISDOM, Circuit Judge:

This case involves the constitutionality of a warrantless search of an automobile. The defendant-appellant, Jerry Gravitt, was convicted on three counts of transporting firearms and ammunition in interstate commerce, in violation of 18 U.S.C. § 922(g)(1)–(2). We affirm.

I.

Jerry Gravitt and his two brothers, Ronnie and Eddie, were arrested outside a lounge in Panama City Beach, Florida, early in the morning on May 15, 1971. The police briefly searched the men at the time of their arrest, and found six .38-caliber revolver shells in one of the defendant's pockets. At the police sta-

tion, officers searched them more thoroughly. On Jerry Gravitt they found a .38-caliber Colt revolver in one of his western-style boots. On Ronnie Gravitt they found a set of car keys and a motel key. The room key was to room 125 in the Tradewinds Motel in Panama City Beach.

Immediately after finding these keys, the police officers proceeded to the Tradewinds Motel. At the desk they discovered that the name on the registration card for room 125 corresponded with the name on false identification cards found on the defendant. He and his brothers had checked in on the morning of May 14, and had prepaid rent for three days. After this check at the desk, the officers went to the motel parking lot, where they found a 1965 Buick in the parking space reserved for room 125. Ronnie Gravitt's key fitted this automobile. One of the officers drove the car to the police station. At the station, he and another officer conducted a thorough search of the vehicle. They testified that in taking custody of the car and in searching its contents, they followed standard police procedures designed to safeguard the property of arrested persons.

The search of the Gravitts' car revealed a small arsenal: a bomb, consisting of a quarter of a pound of "Flex-X" military explosive with a piece of nylon cord wrapped around it, and a number 12 blasting cap; a 6-volt heavy duty Rayovac battery capable of detonating the bomb; an M–1 type 30-caliber carbine; a 12-gauge Remington model 11 shotgun loaded with five rounds of "00" buckshot ammunition; and a .45-caliber fully automatic rifle, with a 30-round magazine attached, fully loaded. In addition to the ammunition in the loaded guns, the officers found ten loose rounds of .45-caliber ammunition, and three loose rounds of 12-gauge "00" buckshot ammunition.

On the afternoon of May 16, a day and a half after Jerry Gravitt's arrest, two agents of the Alcohol, Tobacco, and Firearms Division of the Treasury Department came to the Bay County Jail to question him. During the course of the interview Gravitt confessed to the crimes with which he was later charged. He told the agents that he and his brothers had left Atlanta late in the evening on May 13 and had arrived in Panama City Beach early the next morning, when they checked into the Tradewinds Motel. He said that they had brought with them the weapons found in the car, and related that he had procured all of those weapons while he had been in Georgia. He admitted that he was a fugitive from Georgia, and that he had already served over four years on one robbery conviction. Although there was agreement as to what Gravitt said during the interview, Gravitt and the agents gave conflicting testimony about the circumstances of the confession. The agents testified that they had shown Gravitt a form advising him of his rights to counsel and to remain silent. He stated that he did not need counsel, and that his statements were made freely and voluntarily. Gravitt admitted he had been shown a form advising him of his rights, but contended that he had been induced to make his confession by the agents' promises that they would not prosecute his brothers if he would admit that the guns were his. The agents denied having made these promises.

Jerry and Ronnie Gravitt were indicted on a four-count indictment. Count II of the indictment was quashed.[1] The defendants were convicted on each of the other three counts. Count I charged them with interstate transportation of firearms by persons who were fugitives from justice, in violation of 18 U.S.C. § 922(g)(2). Count III charged them with interstate transportation of fire-

---

1. That count had charged the defendants with the possession of firearms not registered in the National Firearms Registration and Transfer Record, in violation of 26 U. S.C. § 5861(d) (1970).

arms by persons who had been convicted of crimes punishable by imprisonment for more than one year, in violation of 18 U.S.C. § 922(g)(1).[2] Count IV charged interstate transportation of ammunition by persons who had been convicted of crimes punishable by imprisonment of more than one year, also in violation of § 922(g)(1). The defendants were sentenced to imprisonment of five years on each of the three counts. Their sentences on the first and third counts were to run consecutively; their sentences on the fourth count were to run concurrently. Ronnie Gravitt chose not to appeal his conviction.

Jerry Gravitt asserts three grounds for reversal. First, he contends that the search of his automobile violated the fourth amendment, and that therefore the weapons found during that search should have been excluded from evidence. Second, he urges that his confession was not made voluntarily, and that the agents' testimony about it therefore should also have been excluded. Finally, he argues that a verdict of acquittal should have been directed because the Government did not introduce sufficient evidence apart from the defendant's confession to prove the corpus delicti of the offense.

## II.

▆▆▆▆ This Court has consistently recognized that the fourth amendment is not violated when the police take custody of the property of persons they arrest to store that property for safekeeping. United States v. Rosenberg, 5 Cir. 1972, 448 F.2d 1183; United States v. Boyd, 5

Cir. 1971, 436 F.2d 1203; United States v. Lipscomb, 5 Cir. 1971, 435 F.2d 795. In those, and other cases that might be cited, we recognized that when the police take custody of any sort of container— be it an automobile, suitcase, or any other thing in which property may be stored—it is reasonable to search the container to itemize the property to be held by the police. *Boyd,* 436 F.2d at 1185; *Lipscomb,* 435 F.2d at 800–801. These decisions reflect, of course, the underlying principle that the fourth amendment proscribes only *unreasonable* searches. Lipscomb, 435 F.2d at 800, citing Terry v. Ohio, 1968, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889, 899. In *Lipscomb* we articulated the considerations underlying the view that custodial seizures and accompanying inventory searches are reasonable:

> It cannot be denied that to prevent escape, self-injury, or harm to others, the police have a legitimate interest in separating the accused from the property found in his possession. An inventory is then 'necessary both to preserve the property of the accused while he is in jail and to forestall the possibility that the accused may later claim that some item has not been returned to him.

435 F.2d at 800.

Our view is in accord with decisions of other circuits. For example, United States v. Blackburn, 6 Cir. 1968, 389 F.2d 93; Cotton v. United States, 9 Cir. 1967, 371 F.2d 385, 392–393, have joined *Lipscomb* in citing the need to protect the property of the accused as well as to protect the police from un-

---

2. There is an unexplained discrepancy between the list of firearms the indictment sets out under Count I and that it sets out under Count III. Under Count I, the indictment lists as the firearms in question the bomb, the shotgun, the rifle, and the carbine, all of which were found in the car, and adds to the list the revolver found in the appellant's boot during the search at the station. Under Count III, the indictment lists only the firearms found in the car; it makes no mention of the revolver. We do not perceive any reason for this discrepancy. Certainly the interstate transportation of the revolver would seem to be as much a violation of subsection (g)(1) as it is of subsection (g)(2). No reason for the difference appears from anything in the record, and none was adduced in the briefs or on argument on this appeal.

The search of Gravitt's person at the stationhouse was conceded to be valid, presumably as a search incident to an arrest. There was thus no question about the propriety of admitting the revolver into evidence.

grounded claims.[3] The American Law Institute's Model Code of Pre-Arraignment Procedure adopts a view substantially in accord with the decisions in this and the other circuits. ALI, Model Code

of Pre-Arraignment Procedure § 230.-6(3) (Off.Draft No.1, July 1972).[4]

■■ In this case, the search of Gravitt's automobile was lawful under

3. Cotton having been validly arrested and taken· to the police station, the officer would have been derelict in his duty if he had left the car unattended in a dark alley in the middle of the night. The police have as much a duty to protect the property of a suspect as they have to protect the property of the rest of us, and that is what they did in this case by towing the car to the police impound. They also had a duty to keep a record of the property that they had impounded so that it could be returned to the suspect or to its owner in due course.
Cotton v. United States, 371 F.2d at 392.

4. The Commentary to this section of the ALI Code states that, "The Supreme Court has not had occasion to confront 'custodial' or 'inventory' search problems as they relate to the arrested individual's person and accoutrements." ALI, Model Code of Pre-Arraignment Procedure, § 230.6, Commentary at 189. We are in basic agreement with this statement, and our reading of the Supreme Court cases convinces us that none clearly controls our decision here. However, the facts of some of them are very similar to the facts before us, and we feel that it is necessary to state explicitly why we believe those cases do not constitute controlling precedent. Four cases need to be noted in this regard.
The first is Preston v. United States, 1964, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777. In that case the police had impounded and searched the car of a man they had arrested on vagrancy charges, claiming they suspected the car might be stolen. In an opinion by Justice Black, a unanimous Supreme Court held the search unconstitutional. The search there might have been defended on grounds similar to those on which we uphold the search in this case, since after the arrest the car apparently was sitting unprotected on an open city street. But the Government did not raise that theory in the case; instead, it relied on the theory that the search was lawful as a search incident to an arrest. The Supreme Court's opinion is devoted entirely to a rejection of that theory. And the Court, in a later opinion, also written by Justice Black, has made it clear that the *Preston* holding was limited to a ruling that automobile searches of the kind involved there were not permissible as searches incident to an arrest. See Cooper v. California, 1966, 386 U.S. 58, 59–60, 87 S.Ct. 788, 17 L.Ed.2d

730. We conclude, therefore, as the Supreme Court itself apparently did in *Cooper*, that *Preston* does not in any way affect the validity of custodial searches.
*Cooper* itself is the second of the four cases that need to be noted. In that case the Court, by a 5–4 margin, upheld the search of an automobile seized and searched pursuant to a California statute requiring that the police hold the automobiles in which narcotics were found until a forfeiture proceeding could be held. California law provided for the forfeiture of any automobile in which narcotics were found. The Court upheld the seizure, apparently on the basis of the government interest embodied in the forfeiture statutes, and upheld the search on grounds similar to the grounds on which we rest here:
> The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it.

386 U.S. at 61–62, 87 S.Ct. at 791. *Cooper* of course supports our view here; we do not rely on it squarely because it does not address the question whether custodial purposes justified seizing the car in the first place.
The other two cases are Harris v. United States, 1968, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067, and Coolidge v. New Hampshire, 1971, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. In *Harris* the police had impounded a car as evidence. A policeman found a registration card, on the metal stripping over which the door closes, when he opened the door to close the windows to protect the car from the rain. The Court did not reach the question of the permissibility of a custodial search or seizure, because it held, in a per curiam opinion, that the officer's act in opening the windows of the car was not a "search". *Coolidge*, among the four, is the case most distant from the one before us. In *Coolidge*, the police seized an automobile which was lawfully and safely parked outside the defendant's home. The State in that case did not even seek to justify the seizure and subsequent search as custodial. It resorted instead to four other grounds, which need not be detailed here. The Court rejected all of those grounds and held the search unconstitutional.

the standards announced in *Lipscomb* and applied in *Boyd* and *Rosenberg*. The officers here testified that it was standard operating procedure for them to take the automobile of an accused into custody when doing so was necessary to protect the automobile or its contents while the accused was in custody. There can be little doubt that taking custody of the car was necessary here. The officers had arrested men who were travelling in a strange town and whom the officers expected to turn over to Georgia authorities in a few days. The Florida authorities would be held responsible for all the property these men had with them in Panama City Beach. This expectation gave them added reason to itemize the property in the car. In these circumstances both the seizure of the car and the inventory of its contents were not only constitutionally reasonable but necessary and desirable actions for the police to take.[5]

We do not lose sight of the dangers inherent in recognizing a police power to undertake custodial seizures and inventory searches. We recognize, as we did in *Lipscomb* (see 435 F.2d at 801), the possibility that the police might abuse that power by using it as a pretext to excuse themselves after the fact in circumstances where unjustifiedly they had failed to secure a search warrant. But, as in *Lipscomb*, we find little evidence in the case before us to suggest that the search we are examining was pretextual, and we repeat that we are "[not] willing to say that the possibility of a pretextual search is so great . . . that as a matter of law we must condemn the concept of a stationhouse inventory of personal property". *Id.* We are conscious, too, of the possibility that the police, in some circumstances warranting some limited form of inventory search, may often conduct searches which range beyond what is required by any legitimate police need. See Brett v. United States, 5 Cir. 1970, 412 F.2d 401, 406; ALI, A Model Code of Pre-Arraignment Procedure § 230.6, Commentary at 191. But we are confident that here, as in other contexts, reviewing courts will be fully capable of assuring that the scope of the intrusions involved will be tai-

---

5. On oral argument the appellant placed much stress on the fact that the motel rent was prepaid for two days beyond the time of the seizure of the car, and that the car therefore could have remained where it was, in the motel parking lot, for two more days. The argument was that the police did not in fact have to seize the car to protect it, at least not until the time it was entitled to remain where it was had expired. We cannot accept this suggestion. For us, the crucial fact is that the officers had every reason to expect that the detention of the Gravitts would last a good deal longer than two days. Given that fact, it was reasonable for the officers to take the car whenever it was most convenient for them to do so; and presumably it was most convenient immediately following the arrest, when they were at the motel with the car keys. Indeed, the officers' immediate seizure of the car may have been warranted on grounds beyond convenience. There were some dangers involved in allowing the car to sit unattended at the motel for two days, although to be sure the motel management would not have had it towed away during that time. The car might have been stolen or damaged while standing there; or something inside it might have been taken. The officers' action in immediately taking custody of the car appears to have been the prudent thing to do.

The appellant also noted repeatedly on argument that two days was sufficient time for the officers to procure a search warrant. We scarcely need explain why this fact is irrelevant. The government interests which made this search reasonable were, as we have stressed, the police interest in protecting the property of the accused and in protecting themselves. It was not an interest in gathering evidence, such as seizing contraband or dangerous weapons. That is usually involved when a search is made on the basis of a warrant or on grounds that there exists probable cause combined with exigent circumstances. Where interests of the former kind are involved, it is of course of no consequence whether or not there was probable cause. Where it is irrelevant whether there is probable cause, there is no need for the Government to get a warrant. The warrant requirement is operative only when there is a need to determine probable cause. If no warrant need ever have been obtained, then *a fortiori* the fact that there was time in which to obtain one is irrelevant.

lored to the specific public interests which lie at the root of the finding that the intrusions are reasonable. Cf. Adams v. Williams, 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612; Sibron v. New York, 1968, 392 U.S. 40, 65, 88 S. Ct. 1889, 1904, 20 L.Ed.2d 917, 936; Terry v. Ohio, 1968, 392 U.S. 1, 17–19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 904; Warden v. Hayden, 1967, 387 U.S. 294, 310, 87 S.Ct. 1642, 1652, 18 L.Ed.2d 782, 784 (Fortas, J., concurring). Admittedly, the thoroughgoing search of the car in this case, during which the officers looked into the trunk and glove compartment and under the seats, was an intrusion of relatively serious magnitude. We might not be prepared to say that whenever the police have to seize a car for safekeeping they will be entitled to search it so thoroughly. But here, as we have pointed out, the police needed to be certain that they had inventoried the contents of the car completely, given that the men they had arrested were far from home and given the fact that the officers had to deliver the men and their property to authorities of another jurisdiction. In these circumstances, we cannot say that even the relatively serious intrusion involved was not tailored to the police needs we have found to have been involved.

### III.

The appellant's second and third contentions present few problems.

■ A. There is no basis for the appellant's contention that his confession was improperly admitted. The trial judge's actions complied in every respect with the provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 3501 (1970), governing the admissibility of confessions in federal criminal trials. He conducted a hearing out of the presence of the jury to determine the voluntariness of the confession, and he permitted the jury to hear testimony going to the issue of voluntariness.

B. There is also no basis for the appellant's third contention. Gravitt claims that the evidence was insufficient to support the conviction, because the Government failed to prove the *corpus delicti* on the basis of evidence other than the confession. He asserts that there was no evidence other than his confession tending to prove that the firearms in question had ever been in Georgia or that they were transported between states. Therefore, the argument goes, the receipt of the confession into evidence was improper, and the conviction must be reversed.

■ This argument misstates the law. The requirement is only that there be extrinsic evidence corroborating the confession *as a whole*, which, taken together with the confession, is sufficient to support a finding of guilt beyond a reasonable doubt. Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed.2d 192; United States v. Abigando, 5 Cir. 1971, 439 F.2d 827. There is no requirement that there be evidence extrinsic to the confession proving every element of the offense,[6] and no requirement that the extrinsic evidence be sufficient to establish the corpus delicti.[7] If there is extrinsic evidence tending to corroborate the confession, the confession as a whole is admissible; and some elements of the offense may be proven entirely on the basis of a corroborated confession. See *Smith*, 348 U.S. at 156, 75 S.Ct. 194; *Abigando*, 349 F.2d at 832–833.

We deem it unnecessary to catalogue here *all* of the extrinsic evidence corroborating Gravitt's confession, or to de-

---

6. Requiring corroboration of a confession does not mean that the Government must introduce independent evidence on every element of the crime. Requiring independent proof of every element would go beyond the purpose of the rule which is intended to establish the reliability of confessions.

United States v. Abigando, 439 F.2d at 832–833.

7. [C]orroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti.*
Opper v. United States, 1954, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101.

382

tail specific pieces of evidence tending to confirm the truth of the story he gave the officers. There was in - the record testimony by the registration clerk at the motel, by two filling station attendants who had serviced Gravitt's car on the morning of May 14, and by the two Panama City Beach police officers, substantiating parts of Gravitt's story. Indeed, virtually every item of extrinsic evidence tended in one way or another to corroborate Gravitt's substantially complete account of the crime. His was an amply corroborated confession. Taken with the other evidence in the record, it could readily support the jury's finding that his guilt was established beyond a reasonable doubt.

Affirmed.