577 F.2d 883
 UNITED STATES of America, Plaintiff-Appellee,
v.
Alvin Leon EDWARDS, Defendant-Appellant.
 No. 76-1668.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 1, 1978.
 
 H. Gilman Hudnall, Jr. (Court-appointed), Atlanta, Ga., for defendant-appellant.
 William L. Harper, U. S. Atty., William F. Bartee, Jr., Dorothy T. Beasley, Asst. U. S. Attys., Atlanta, Ga., Victor D. Stone, Washington, D. C., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before BROWN, Chief Judge, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, SIMPSON, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.
 
 BY THE COURT:
 
 1
 The defendant Edwards was convicted in a jury trial of possessing stolen mail with knowledge that the mail was stolen in violation of 18 U.S.C. § 1708. On appeal, the defendant contends that he was deprived of the right to a speedy trial, that the trial court erred in allowing the admission of hearsay testimony at a pre-trial hearing on a motion to dismiss the indictment, and that the court committed error in denying his motion to suppress evidence obtained in a search of his automobile shortly after his arrest. The government, in turn, challenges the defendant's standing to contest the constitutionality of the search, and, in any event, seeks to uphold the search and seizure alternatively as incident to a lawful arrest, based upon probable cause, and within the scope of a valid inventory search. We conclude that the defendant was not deprived of his right to a speedy trial, nor did the trial court commit reversible error in admitting hearsay testimony at the pre-trial hearing. We also conclude that the search of the automobile was a valid inventory search, and we therefore need not reach the other two issues. Accordingly, the panel opinion found at 554 F.2d 1331 is vacated. We find no error and affirm the rulings of the trial court.
 
 I. SPEEDY TRIAL
 
 2
 The defendant was charged with the offense on May 2, 1974, and was bound over for trial after a preliminary hearing held on May 10, 1974. An indictment was not returned until June 3, 1975, and, after entering a plea of not guilty, the defendant was convicted on January 20, 1976. The defendant contends that the thirteen month post-arrest, pre-indictment delay constituted a denial of the right to a speedy trial in violation of the Sixth Amendment and Rule 48(b) of the Federal Rules of Criminal Procedure.[1] It is important to note that the period between arrest and trial was approximately twenty-one months in duration.
 
 
 3
 In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court held that in determining whether a defendant has been denied the right to a seedy trial as a result of post-indictment delay, the Court must utilize a balancing test, weighing the conduct of the prosecution with that of the defendant. The Court should consider such factors as the length of delay, the reason for delay, whether the defendant asserted his right to a speedy trial, and whether the defendant has suffered prejudice as a result of the delay. These factors, although expressly set forth in Barker, are not necessarily to be considered as exclusive.
 
 
 4
 It is settled in this Circuit that the test enunciated in Barker is also to be applied in determining whether a period of post-arrest, pre-indictment delay has deprived the defendant of his right to a speedy trial. United States v. Palmer, 537 F.2d 1287 (5th Cir. 1976); See also United States v. Garza, 547 F.2d 1234 (5th Cir. 1977). Hence, the Barker test will be applied to the entire period between arrest and trial, approximately 21 months in duration.[2]
 
 
 5
 The first prong of Barker, the length of delay, is merely a threshold "triggering mechanism."[3] The Court need not inquire into the other factors unless there has been a delay of such length as to be " presumptively prejudicial."[4] The question of presumptive prejudice is to be determined according to the facts and circumstances surrounding each particular case. In the case at bar, considering the lack of complexity of the factual and legal issues, the twenty-one month period between arrest and trial provides a sufficient springboard for inquiry into the other factors.[5] The twenty-one month delay, however, is not sufficient in itself to warrant a finding that the defendant has been denied the right to a speedy trial. See United States v. Garza, supra; United States v. Palmer, supra.
 
 
 6
 The record is unclear as to the reason for the delay in this case.[6] The government contends in its brief that the delay was occasioned by the inability to locate one Betty Davis, a potential defendant in the case. No indication is made, however, as to why the inability to locate a potential defendant delayed grand jury proceedings as to the defendant, Edwards. It may be that the government was seeking to construct a more airtight case against Edwards with the assistance of the testimony of Davis, or that the government was seeking to exercise judicial economy and protect the interests of the defendant by delaying indictment. See United States v. Lovasco, 431 U.S. 783, 792-93, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). In United States v. Avalos, 541 F.2d 1100 (5th Cir. 1976), cert. denied, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977), we recognized that locating a missing witness or accumulating the evidence necessary to build a prima facie case against the accused may justify appropriate delay. The record does not in any way support an inference that the delay was a deliberate attempt to gain a tactical advantage or to hamper the accused, condemned in Barker.[7] On the other hand, the government does not allege that any significant part of the delay was attributable to acts of the defendant. Even assuming that some delay was permissible, it would be difficult to justify a twenty-one month delay on the facts of this case. This factor must accordingly be weighed against the government in the balancing process.
 
 
 7
 The third factor expressly set forth in Barker, assertion of the right to a speedy trial by the defendant, is particularly troublesome. On the one hand, the court in Barker stated that "A defendant has no duty to bring himself to trial . . ." 407 U.S. at 527, 92 S.Ct. at 2190. Conversely, in the same opinion, the Supreme Court emphasized that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Id. at 532, 92 S.Ct. at 2193. Regardless of the apparent incongruity, assertion of the right is a factor which we must consider. In the case at bar, the defendant first asserted his right to a speedy trial more than thirteen months after his arrest, when he filed a motion to dismiss the indictment. It is plausible that the alleged difficulty encountered by the defendant in locating witnesses may have contributed to his reluctance to assert his speedy trial right. In any event, it is clear from the record that the defendant did not vigorously assert the right prior to return of the indictment. Such assertions, if present, would have weighed heavily against the government. The defendant's pre-indictment silence is a factor which should be weighed in favor of the government. See United States v. Garza, 547 F.2d 1234 (5th Cir. 1977).
 
 
 8
 The record simply does not support a finding that the defendant suffered prejudice as a result of the delay.[8] The defendant contends that his trial defense was prejudiced by the delay in that he and other witnesses suffered a loss of memory as to significant details, that he was unable to locate alibi witnesses, and that a key witness, the defendant's half-brother, died approximately one month prior to commencement of the trial.[9]
 
 
 9
 Although faded memory may result in prejudice, we have held that in order to prejudice the defense to the extent necessary to constitute a speedy trial violation, the faded memory must substantially relate to a material fact in issue. United States v. Avalos, 541 F.2d 1100 (5th Cir. 1976); cert. denied, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977). Vague assertions of faded memory will not suffice. We have carefully reviewed the instances of lapsed memory appearing in the record as cited to us by the defendant, and we conclude that none of the lapses substantially relate to a material issue. In fact, many, if not all, of the examples of faded memory appearing in the record are totally inconsequential.
 
 
 10
 Nor are we persuaded that the delay resulted in the unavailability of material witnesses. The defendant contends that he was unable to locate an alibi witness as a result of the delay, as well as the witnesses involved in the initial reporting of the offense. With respect to the alleged alibi witness, we fail to perceive how the defendant was prejudiced by the delay. The longer the delay, the greater the opportunity for locating the missing witness. We simply refuse to accept the contention of the defendant that even though he was arrested and formally charged with the offense in question, he had no duty to begin to locate and interview potential alibi witnesses until after he was indicted thirteen months later. The defendant's argument is belied by the fact that his attorney visited the project from whence the checks were stolen within two weeks of the defendant's arrest.[10] The same holds true for the alleged inability to locate the residents of the project involved in the reporting of the mail thefts. The delay gave the defendant more time to locate these individuals. In any event, no prejudice has been shown because the record reveals that the defendant's attorney was aware of their identity and location three months before the trial commenced and that he reasonably should have been aware of their identity well in advance of this time.[11]
 
 
 11
 Finally, we are unable to conclude that the death of the defendant's half-brother prior to trial prejudiced his defense. The death of a material defense witness during an unexcused period of prosecutorial delay obviously may prejudicially affect a defendant's case. While the defendant points out that the automobile in which the stolen checks were found was owned by his half-brother, there is no indication as to the nature of the exculpatory testimony which would have been elicited from the deceased. In fact, there was no mention of the deceased as a potential witness until after his death. From the posture of the record before us, we can only conclude that the most favorable testimony which could have been elicited from the deceased was that he was the owner of the vehicle and had driven the vehicle on the date of the defendant's arrest.[12] The same testimony was adduced from the defendant when he took the stand. Although we recognize that the testimony by the deceased may have corroborated the testimony of the defendant and may have affected the weight of the evidence, we must nevertheless conclude that on the basis of this record the defendant did not suffer sufficient prejudice to constitute a violation of his right to a speedy trial. This is especially so in light of the sparse nature of the record concerning the testimony, if any, which the defense expected to elicit from the deceased half-brother.
 
 
 12
 We have balanced the factors of Barker and have concluded that the twenty-one month delay between arrest and trial did not deny the defendant the right to a speedy trial in violation of the Sixth Amendment. The defendant established an unjustified prima facie delay but has failed to sufficiently demonstrate either an assertion of the right or actual prejudice. Denial of the defendant's motion to dismiss the indictment for failure to afford a speedy trial did not constitute an abuse of discretion requiring dismissal pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure.
 
 II. SEARCH OF THE AUTOMOBILE
 A. Facts
 
 13
 The facts, considered in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), reveal that on May 1, 1974, police officer Williams was summoned to a housing project in Atlanta, Georgia. Upon arrival, the family service officer of the project, Mrs. McVickers, informed officer Williams that she had received a phone call from a resident of the project reporting that two black females had been seen taking checks from mailboxes in the project. The two females were described in detail and it was also reported that they had been seen with a black male wearing a "superfly"[13] hair style who was driving a maroon over white Cadillac.
 
 
 14
 Shortly thereafter, officer Williams observed the defendant, a black male with a superfly hair style, sitting in a maroon over white Cadillac in the housing project. Officer Williams approached the parked automobile while officer Shaw, who had just arrived on the scene, proceeded to question a black female observed nearby who matched the description of one of the females allegedly observed taking checks. As officer Williams approached the Cadillac he observed the defendant bend down as if to place something on the floor. The officer asked to see the defendant's driver's license to which the defendant responded that he did not possess a driver's license and that he was waiting for his brother, the owner of the car, who was in the project. Officer Williams then received permission to visually inspect the automobile. The defendant stepped out of the automobile and the officer leaned over and peered in, and, observing nothing unusual, terminated the visual perusal. Officer Shaw returned and reported that the female denied that she knew the defendant and that nothing else in furtherance of the investigation had developed.
 
 
 15
 In order to further pursue the investigation, officer Shaw concealed himself between two houses and monitored activities at the project through the use of binoculars. Shaw observed the defendant conversing with the black female who earlier had denied that she knew him, and the defendant then drove off in the Cadillac. Shaw rejoined officer Williams and reported the activities he had observed. Knowing that the defendant did not have a driver's license, officer Williams immediately sought to locate him for the purpose of effecting an arrest. The defendant was stopped while driving the automobile in the project and was arrested for driving without a license. The defendant was also cited for driving without a valid inspection sticker. Officer Williams acquired possession of the keys to the Cadillac and placed the defendant in the back seat of the patrol car.
 
 
 16
 Pursuant to standard practice, the officer then began to conduct an inventory search of the automobile. Officer Shaw joined in the search, during the course of which officer Williams found two stolen welfare checks, as well as several identification cards under different names on the front seat, two of which contained the photograph of the black female who had been seen conversing with the defendant. The checks, in envelopes, were located next to the power seat lever between the driver's seat and the door where two separate parts of the rug overlap. Officer Williams lifted the loose "carpet flap" in order to locate the envelopes but did not remove any nails or fasteners, or in any other way separate the carpet from the floor of the automobile.
 
 B. Standing
 
 17
 We are met at the outset with the contention by the government that the defendant lacks standing to contest the validity of the automobile search. While we have serious doubts concerning the viability of the "automatic standing"[14] rule in light of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968),[15] and Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973),[16] we need not reach the issue of automatic standing because the defendant here has standing on an independent ground.[17] A defendant has standing to contest the validity of the search if a "reasonable expectation of privacy" was violated by the intrusion. United States v. Nunn, 525 F.2d 958 (5th Cir. 1976). The decisions of this Court reflect that lawful presence in a vehicle at the time of a stop for the purpose of effecting a search is sufficient to confer the reasonable expectation of privacy essential to a claim of standing. See, United States v. Holmes, 521 F.2d 859, 870 (5th Cir. 1975), rev'd in part, 537 F.2d 227 (5th Cir. 1976); United States v. Foster, 506 F.2d 444, 445 (5th Cir. 1975), cert. denied, 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104 (1975).[18] This defendant was the sole occupant of the vehicle at the time it was stopped and searched. There can be no doubt that this defendant was "a victim of a search or seizure, one against whom the search was directed,"[19] and this characteristic, accompanied by an intrusion into a reasonable expectation of privacy,[20] establishes the requisite standing to challenge the validity of the search and seizure. Although the defendant was admittedly not the owner of the vehicle, this is not a case wherein an individual claims prejudice as a result of the violation of the constitutional rights of another.
 
 C. Inventory Search
 
 18
 As we have outlined above, subsequent to the arrest of the defendant, officers Williams and Shaw conducted a search of the automobile. The defendant does not dispute that it is a standard practice of the Atlanta police department to conduct inventory searches of automobiles to be impounded, but has squarely put into issue the question of whether the search was unreasonable in scope, exceeding the bounds of a constitutionally permissible inventory search.[21]
 
 
 19
 The constitutional validity of inventory searches was recognized by the Supreme Court in South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). In Opperman, the Court held that such searches are reasonable if conducted in accordance with standard police practice. The Court noted that an inventory search serves three distinct purposes: the protection of personal property which may be in the automobile, the protection of the police against claims arising from property allegedly lost or stolen while the automobile is in police custody, and the protection of the police from possible danger.
 
 
 20
 Our reading of Opperman, however, has led us to conclude that an inventory search may not be unlimited in scope. Once again, we are guided by the standard of reasonableness. Only so long as the scope of the search is reasonable, taking into consideration the three interests to be protected by the inventory, will it be held to be a constitutionally permissible intrusion.[22] The complete dismantling of an automobile, or parts thereof, for example, would not withstand constitutional scrutiny because such action would not reasonably serve to promote or further the interests which justify an inventory search. Rather, the three interests set forth in Opperman can be adequately protected if the inventory search is limited in scope to those places within the interior or trunk of an automobile where, under the particular circumstances of the case, property of the owner or occupant can reasonably be expected to be found. The standard we advocate is necessarily flexible and is to be applied on a case by case basis, but it nevertheless adheres to the constitutional mandate that only unreasonable searches and seizures are prohibited.
 
 
 21
 The potential abuse inherent in the inventorial process, and the concomitant need to limit its scope, was recognized in this Circuit prior to sanction of the inventory search by our highest court in Opperman. We made the following observations in United States v. Gravitt, 484 F.2d 375, 380-81 (5th Cir. 1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974):
 
 
 22
 We are conscious, too, of the possibility that the police, in some circumstances warranting some limited form of inventory search, may often conduct searches which range beyond what is required by any legitimate police need . . . But we are confident that here, as in other contexts, reviewing courts will be fully capable of assuring that the scope of the intrusions will be tailored to the specific public interests which lie at the root of the finding that the intrusions are reasonable.
 
 
 23
 We now turn to the facts of this case to determine whether the inventory search was reasonable. There can be no doubt that the search was thorough. The record reveals that the officers searched the glove compartment, the trunk, under the seats, and even the crevices between the seats. However, we refuse to necessarily equate thoroughness with unreasonableness. The reasonableness of the search of the automobile floor, under a loose "carpet flap" in particular, is the issue with which we are confronted today.
 
 
 24
 The starting point of our analysis is that the police, in conducting an inventory search, may ordinarily inspect the glove compartment, the trunk, on top of the seats as well as under the front seats, and the floor of the automobile.[23] An inspection of these areas is reasonable because these are common locations in or on which it is reasonably to be expected that the owner or occupant of an automobile may place items of personalty. The intrusion, although serious, is justified by the need to protect the property of the owner, and to protect the police from claims. This is to say no more than in the typical case it is not unreasonable for the police to search such places while conducting an inventory.
 
 
 25
 In the case at bar there are two additional reasons why it was highly reasonable for the officer to carefully inspect the floor of the automobile. Officer Williams testified that he had observed the defendant, at an earlier time, bend over as if to place something on the floor. This action by the defendant reasonably alerted the officer that property may have been placed on the floor of the automobile. Secondly, officer Williams testified that he found several identification cards strewn about on the front seat. He could reasonably conclude therefrom that there may be other such items between the seats or possibly on the floor.
 
 
 26
 While searching the floor region near the power seat lever between the driver's seat and the door, officer Williams noticed that two separate parts of the carpet overlapped, concealing an area where property could be secreted. The officer then lifted the loose "carpet flap", revealing the envelopes containing the stolen checks. We conclude that such action by the officer was reasonable under the circumstances of this case. We emphasize that the officer merely lifted the loose flap and did not remove any nails or fasteners, or in any other way separate the carpet from the floor of the automobile. Additionally, a short time earlier the officer had observed the defendant make a suspicious move toward the floor of the automobile. The officer could reasonably conclude that property may have been concealed beneath the carpet flap. He may have been in dereliction of duty had he not searched such an obvious place of concealment.
 
 
 27
 We reiterate that we do not in any way condone searching under the carpeting in every case, much less the ripping apart of an automobile, or any part thereof, under the guise of an inventory search. The intrusion in each case must be limited in scope to the private and public interests which underlie the inventory. We recognized our responsibility in this area in Gravitt, supra. We today hold that in conducting an inventory search pursuant to standard police practice, an officer may search those places within an automobile where, under the facts of the particular case, he can reasonably conclude that personal property may be located.
 
 
 28
 Because we have concluded that the stolen checks were located during a valid inventory search, we affirm the rulings of the trial court.
 
 D. Probable Cause
 
 29
 We have concluded that were we testing this warrantless search of the automobile under the requirements of probable cause coupled with exigent circumstances our conclusion would be the same. It is well settled that probable cause to search an automobile exists when trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband. United States v. Clark, 559 F.2d 420, 424 (5th Cir. 1977). We must also be mindful that "probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers. We weigh not individual layers but the 'laminated' total." Smith v. United States, 123 U.S.App.D.C. 202, 206, 358 F.2d 833, 837 (1966), cert. denied 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). As we noted in Clark, supra, "Viewing the evidence in this manner (in its totality) it may truly be said that the total may be a sum greater than its parts." Id.
 
 
 30
 The government concedes that the officer did not possess probable cause to effect a search of the automobile at the time of the arrest. The arresting officer testified that he stopped the defendant to arrest him for driving without a valid driver's license and not for possession of stolen mail. Admittedly, the search was instituted as an inventory search and not pursuant to probable cause coupled with exigent circumstances. The crux of the government's contention is that the inventory ripened into probable cause to conduct a warrantless search upon discovery, on the front seat, of the identification cards, under different names, containing the picture of Minnie Mosley.[24] Mosley is the black female allegedly seen taking checks from mailboxes who was also seen conversing with the defendant.
 
 
 31
 Although the defendant was arrested for driving without a license, officer Williams harbored the suspicion that the defendant was involved in the theft of the checks at the time he commenced the inventory search. He had received a report from the service manager of the project that the defendant had been seen with the black females allegedly involved in taking checks. Additionally, officer Shaw had observed the defendant conversing with one of the females. At this point, the officer's suspicions concededly had not ripened into probable cause. Officer Williams then found the identification cards containing the picture of the woman who had denied that she knew the defendant in the automobile being driven by the defendant.[25] More importantly, the identification cards were under the names of different individuals, adding further fuel to his suspicions. The officer could reasonably believe that these cards were essential to accomplishing the ultimate goal of the theft, the cashing of the checks. Additionally, the defendant had acted suspiciously when the officer first approached the automobile for questioning and had bent over as if to conceal something on the floor or under the seat. We feel that all of the facts then personally known by officer Williams were sufficient to create probable cause to search the automobile completely. The cumulative facts were sufficient to cause a person of reasonable caution to believe that the defendant was involved with one or more individuals in the theft of mail and that the checks may be concealed in the automobile.[26]
 
 
 32
 The judgment is AFFIRMED.
 
 
 33
 JOHN R. BROWN, Chief Judge, with whom COLEMAN, AINSWORTH and GEE, Circuit Judges, join, concurring in part and dissenting in part.
 
 
 34
 I concur in the result and all of the opinion except Part II B Standing. The time has come for us to reject outright the concept of "automatic standing" to which Brown v. United States, 1973, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208, and Simmons v. U. S., 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, gave all but the coup de grace.
 
 
 35
 And if we have held that mere presence in a vehicle confers a reasonable expectation of privacy, we should undo it as having no foundation in common experience which is the sole source for judicial pronouncements. And certainly none here. Edwards did not own the car. Perhaps he was authorized to sit in the car, but neither he nor anyone else could drive it since it was unlicensed.
 
 
 36
 On what do we base this conclusion, not only that Edwards had an expectation of privacy in the automobile as a stationary office, but equally important that the officers would sense this and leave the automobile alone?
 
 
 37
 The sweeping statement that mere presence turns the trick gives the awesome protection to a hitchhiker, a girlfriend for the short ride from home to a nearby movie, a pickup at the stop light of a stranded motorist whose battery has gone dead, and almost an unlimited group of others occupying the vehicle briefly.
 
 TJOFLAT, Circuit Judge, specially concurring:
 
 38
 In the proceedings below, the district court gave Edwards "automatic standing" to contest the search of the Cadillac. United States v. Edwards, 554 F.2d 1331, 1333-34 n.2 (5th Cir., 1977). Consequently, Edwards offered no evidence at the suppression hearing to support the notion that he had an interest in the Cadillac sufficient to give him standing to question the officer's intrusion. All that was revealed was the naked fact that Edwards was sitting in the car waiting for his brother. The record of the suppression hearing contains not the slightest hint as to the identity of the Cadillac's owner or Edward's authority to be in the car.
 
 
 39
 I would not indulge in appellate fact finding, as the majority has done, to conclude that Edwards had standing to question the search. Rather, I would face the "automatic standing" concept head on, as Chief Judge Brown suggests in his concurring opinion, giving it the coup de grace in the process. Finally, I would affirm the district court, instead of remanding the case to determine whether Edwards has actual standing, because the record clearly demonstrates that the search of the Cadillac was supported by probable cause.
 
 
 40
 ALVIN B. RUBIN, Circuit Judge, with whom RONEY, Circuit Judge, joins, concurring in part and dissenting in part.
 
 
 41
 I concur in the majority opinion with the exception of Part II C (Inventory Search), from which I respectfully dissent.
 
 
 42
 In my opinion, the search went far beyond anything reasonably necessary to accomplish any of the permissible purposes of making an inventory of the contents of the automobile as those are set forth in South Dakota v. Opperman, 1976, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000; see also United States v. Gravitt, 5 Cir. 1973, 484 F.2d 375, 380-381, cert. denied, 1974, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761. The officers were no longer making an effort simply to list the unsecured contents of the vehicle but, in the half hour spent searching the automobile, were seeking evidence in places where it could have been concealed. See United States v. Hellman, 9 Cir. 1977, 556 F.2d 442.
 
 
 43
 Nevertheless, I concur in the result because the search under the carpet was based on probable cause when it was made. What began as a proper inventory search led to discovery of several identification cards. (It was reasonable, I think, for the security officer to read the cards and, in this respect, I differ with the panel opinion. Even for the barest inventory search, some description beyond the size of the paper was desirable: this could be obtained only by an examination of the cards. Looking at what was patent was not like the scrutiny of the contents of a book or a diary, which could be described and listed without reading their contents.) The cards showed photographs of a person who had been seen conversing with the defendant but who had denied knowing him, and who was apparently using different names. These circumstances, in the light of the reports received and the defendant's conduct, furnished reasonable cause to search further. Chambers v. Maroney, 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; United States v. Freund, 5 Cir. 1976, 525 F.2d 873, 875. See also Texas v. White, 1975, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209. Nor was it necessary under the circumstances to obtain a warrant. See United States v. Chadwick, 1977, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538; Texas v. White, supra; Cady v. Dombrowski, 1973, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706.
 
 
 44
 GOLDBERG, Circuit Judge, with whom GODBOLD and SIMPSON, Circuit Judges, join, concurring in part but dissenting in the result.
 
 
 45
 I wholeheartedly concur in the conclusion of Part II B of the majority opinion that appellant has standing to contest the validity of the automobile search. I remain unconvinced, however, that the officers had probable cause to conduct the search in question or that the officers stayed within the constitutionally permissible bounds of an inventory search. Adhering to my views on these issues as expressed in the panel opinion, reported at 554 F.2d 1331 (5th Cir. 1977), I respectfully dissent from the result in this case and would reverse the judgment of the district court.
 
 
 
 [1]
 The defendant has not clearly distinguished in brief or in oral argument between the Sixth Amendment guarantee of a speedy trial and the statutory protection afforded by Rule 48(b) of the Federal Rules of Criminal Procedure. Rule 48(b) vests much discretion in the trial court and a dismissal on speedy trial grounds is not mandatory unless the defendant's constitutional speedy trial rights have been violated. United States v. Clendening, 526 F.2d 842, 844 n.2 (5th Cir. 1976); United States v. Palmer, 502 F.2d 1233, 1234 n.3 (5th Cir. 1974); rev'd and remanded on other grounds sub. nom., Dillingham v. United States, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975), aff'd, United States v. Palmer, 537 F.2d 1287 (5th Cir. 1976)
 The defendant does not contend that the pre-indictment delay deprived him of due process in violation of the Fifth Amendment. In any event, such a claim would require a showing of actual prejudice. United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The defendant has made no such showing in this case.
 Neither party to this appeal has addressed the applicability of the Plan for Achieving Prompt Disposition of Criminal Cases promulgated pursuant to Rule 50(b) of the Federal Rules of Criminal Procedure by the United States District Court for the Northern District of Georgia, effective January 1, 1973. This plan provides that the defendant is to be arraigned within 30 days of the return of the indictment, and, if not in custody, is to be tried within 180 days from the date of arraignment. The plan contains no provision concerning the allowable time between arrest and indictment. In the case at bar, approximately 44 days elapsed between indictment and arraignment and 185 days elapsed between arraignment and trial. The plan provides that failure to comply with the time limitation may result in such actions as the court deems appropriate, including dismissal of the action pursuant to Rule 48(b). The defendant's motions to dismiss the indictment, filed prior to trial and again at trial, were not predicated upon failure to comply with the Rule 50(b) plan. But, even if they had been so predicated, denial of said motions would certainly not constitute an abuse of discretion requiring dismissal under Rule 48(b).
 For the sake of clarity, we deem it necessary to discuss the applicability of two additional plans. The Speedy Trial Act of 1974, 18 U.S.C. § 3161, et seq., mandates that the district courts adopt transitional plans to operate pending full implementation of the Act in 1979. Pursuant to the Act, the United States District Court adopted the "interim Plan", effective September 29, 1975, to supplant the Rule 50(b) plan. The Interim Plan contains provisions providing for the same time limitations as the Rule 50(b) plan, as outlined above, for the period between indictment and arraignment, and arraignment and trial. The Interim Plan is also silent concerning pre-indictment delay and provides for discretionary dismissal under Rule 48(b) for failure to comply with the time limitations prescribed in the plan.
 In United States v. Clendening, supra, we held that "so long as a procedural innovation does not operate to the detriment of a defendant, it is applicable to pending cases even though some or all of the circumstances giving rise to a particular case occurred prior to the effective date of the new rule." 526 F.2d at 846. In this case, the defendant was indicted and arraigned prior to the effective date of the Interim Plan. However, we need not reach the issue of whether the Interim Plan or the Rule 50(b) plan governs the disposition of this case because the provisions of each plan applicable to this case are substantively identical.
 A subsequent plan for achieving the prompt disposition of criminal cases in the Northern District of Georgia became effective on July 1, 1976. That plan is of course not applicable to this case as the defendant was tried on January 20, 1976.
 
 
 [2]
 In United States v. Avalos, 541 F.2d 1100, 1108 (5th Cir. 1976), cert. denied, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977), this court observed that Dillingham v. United States, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975), "establishes that arrest constitutes the initiation of a prosecution for purposes of applying the speedy trial test of Barker v. Wingo . . . . regardless of whether a formal indictment has been returned."
 We fail to perceive why the defendant has chosen to rely only upon the delay between arrest and indictment as the basis for his speedy trial claim, especially in light of the fact that an operative event which the defendant claims caused prejudice, the death of his half-brother, occurred after he was indicated and prior to trial. We have concluded that the 21 month delay between arrest and trial did not result in a violation of the defendant's constitutional right to a speedy trial; a fortiori, the thirteen month delay between arrest and indictment did not constitute a constitutional deprivation.
 
 
 [3]
 407 U.S. at 530, 92 S.Ct. 2182
 
 
 [4]
 Id
 
 
 [5]
 See United States v. Avalos, supra, where a fifteen month delay in a complex conspiracy case was held to be sufficiently serious to satisfy the threshold requirement of lengthy delay
 
 
 [6]
 The Magistrate, in his report, noted that "the Government has offered no explanation for the post-arrest pre-indictment delay."
 
 
 [7]
 407 U.S. at 531, 92 S.Ct. 2182
 
 
 [8]
 We are mindful that in United States v. Avalos, supra, we noted that when the first three factors of the Barker balancing test are heavily weighted against the government, the defendant need not demonstrate any prejudice at all. This is not such a case, however, as the government has not idly ignored vigorous speedy trial assertions for a twenty-one month period. As we have already noted, the defendant did not even assert his speedy trial right until thirteen months after arrest
 
 
 [9]
 The defendant's prejudice argument is premised upon impairment of his defense, as opposed to personal prejudice resulting from anxiety and community scorn. See Barker, 407 U.S. at 532-33, 92 S.Ct. 2182
 
 
 [10]
 The defendant's argument concerning prejudice resulting from the alleged missing alibi witness must fail for yet another reason. The crux of the defendant's alibi defense is that one Betty Davis, a resident of the housing project in question, is the only person who can verify that he visited her apartment and thus was not present in the automobile where the checks were found on the date of arrest. The record reveals, however, that Minnie Mosley, who was available and could have testified at trial, could also verify the amount of time that the defendant spent in the Davis apartment. Hence, even if the delay resulted in the unavailability of Betty Davis, Mosley could have been called to provide the same testimony expected from Davis. We recognize that the testimony of Davis might have the cumulative effect of increasing the weight of the evidence, but, nevertheless, conclude that the absence of Davis did not sufficiently prejudice the defendant
 
 
 [11]
 The defendant further contends that the trial court committed error by allowing the introduction of hearsay evidence to rebut the defendant's assertion of prejudice at the pretrial hearing on the defendant's motion to dismiss the indictment. This evidence consisted of the testimony of Postal Inspector Brooks regarding notes taken by Postal Inspector Thigpen concerning his investigation of this case. The gist of the testimony was that within six weeks of the defendant's arrest, Thigpen interviewed the housing project employee who notified the police and the resident of the project who witnessed the mail theft. The defendant's attorney had stated at the hearing that he conducted two investigations at the project within two months of the arrest and was unable to locate either individual. Assuming that the admission of such testimony did constitute error, we conclude that the error was harmless in light of the other evidence in the record from which the trial court could conclude that the defendant did not suffer prejudice as a result of the delay. For example, although the defendant's attorney was informed at the preliminary hearing that the investigating officer received the report of the theft from the resident manager, the defendant's attorney did not interview the resident manager until over a year after the arrest. There is no indication in the record why the defendant's attorney did not interview the resident manager right after he learned that she reportedly made the initial contact with the police. Such an interview would have revealed that she did not in fact make the report and would have put him on notice of the need to interview other employees. Had he done so, he would most likely have discovered that the service manager, and not the resident manager, had reported the incident
 Furthermore, as the testimony adduced at the pre-trial hearing on the motion to dismiss the indictment indicates, the defendant's attorney interviewed the investigating police officer on May 10, 1974. The police officer had interviewed the service manager at the project and could certainly have lent assistance in ascertaining her identity and location. Although we concededly do not have before us in the record a transcription of the interview between the defendant's attorney and the investigating officer, a review of the transcript of the preliminary hearing, also held on May 10, 1974, reveals that the defendant's attorney did not make any attempt to obtain identifying information concerning the person who was allegedly the resident manager, other than that she was a woman. The record, apart from the hearsay testimony, clearly supports the conclusion that failure to locate the witnesses was due to the investigatory technique employed by the defendant's attorney rather than prosecutorial delay.
 
 
 [12]
 The defendant does not suggest that the deceased intended to waive his privilege against self-incrimination and admit that he was in possession of the checks without the defendant's knowledge. Even if such a suggestion had been made by the defendant, it certainly would not be supported by the record
 
 
 [13]
 The so-called superfly hair style is characterized by the hair being straightened and combed down
 
 
 [14]
 In Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the Court established a per se rule of standing when possession is an essential element of the offense charged
 
 
 [15]
 The Court in Simmons held that testimony given by the defendant to establish standing at a pretrial suppression hearing is inadmissable at trial. The defendant can assert possession at the suppression hearing in order to establish the requisite standing without being in the precarious position of waiving his privilege against self-incrimination
 
 
 [16]
 In Brown, the Court recognized that Simmons may alleviate the self-incrimination dilemma sought to be avoided by the Court in Jones, therefore rendering unnecessary the rule of automatic standing. Nevertheless, the Court expressly reserved decision of this issue
 
 
 [17]
 The Supreme Court in Brown v. United States, 411 U.S. 223, 227 n.2, 93 S.Ct. 1565, 1568, 36 L.Ed.2d 208 (1973), stated that:
 Presence of the defendant at the search and seizure was held, in Jones, to be a sufficient source of standing in itself.
 
 
 [18]
 See also United States v. McConnell, 500 F.2d 347 (5th Cir. 1974), cert. denied 420 U.S. 946, 95 S.Ct. 1327, 43 L.Ed.2d 424 (1975); United States v. Mendoza, 473 F.2d 692 (5th Cir. 1972)
 
 
 [19]
 Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960)
 
 
 [20]
 Although the Court in Opperman, supra, 428 U.S. at 367, 96 S.Ct. at 3096, recognized that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office," it is certainly clear that an individual enjoys an expectation of privacy with respect to items secreted within the interior of the automobile
 
 
 [21]
 We reject the defendant's contention that the search was pretextual. The officers testified that it is standard police practice to conduct an inventory search before an automobile is taken into custody. The defendant was arrested while driving the automobile and the owner was not present. The facts of this case do not reveal an inventory search conducted "after the fact in circumstances where unjustifiedly they had failed to secure a search warrant." United States v. Gravitt, 484 F.2d 375, 380 (5th Cir. 1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974)
 
 
 [22]
 In Opperman the Court held that "The inventory was not unreasonable in scope." 428 U.S. at 376 n.10, 96 S.Ct. at 3100. The court, citing Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), also noted that the fact that an inventory search is conducted in accordance with standard police practice is "a factor tending to ensure that the intrusion will be limited in scope to the extent necessary to carry out the caretaking function." 428 U.S. at 375, 96 S.Ct. at 3100
 
 
 [23]
 We reject the defendant's contention that the police may only inventory items found in plain view within the cabin of the automobile. The Court in Opperman upheld the search of the glove compartment, to which vandals would have easy access, although items of personalty were observable within plain view within the automobile. This Court has upheld an inventory search of the trunk of an automobile, United States v. Wade, 564 F.2d 676 (5th Cir. 1977), as well as a search extending to the trunk, glove compartment, and under the seats. See United States v. Gravitt, 484 F.2d 375 (5th Cir. 1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974)
 We likewise reject the defendant's assertion that the officers should have asked him whether there were any items in the automobile which he wanted them to inventory for caretaking purposes. This contention ignores the fact that the inventory is not for the exclusive protection of the owner or occupant of the vehicle. See Opperman, supra, 428 U.S. at 376 n.10, 96 S.Ct. 3092. Secondly, the defendant was admittedly not the owner of the automobile and was therefore not in a position to know whether there were items of personalty within the automobile which the owner would want the police to inventory for safekeeping.
 
 
 [24]
 We have been unable to locate evidence in the record expressly disclosing that officer Williams found and identified the cards before he found the checks beneath the carpet. The record does indicate, however, that the identification cards were found in plain view on the front seat of the automobile. It is certainly reasonable to conclude from the record that the cards were in fact located and identified before the checks were found
 
 
 [25]
 In determining whether the police officer had probable cause to conduct the search, it is immaterial that the identification cards were not introduced into evidence at the trial
 
 
 [26]
 Because the search is justifiable as an inventory search and pursuant to probable cause coupled with exigent circumstances, we need not reach the issue of whether the search was also incident to a lawful arrest