UNITED STATES of America,
Plaintiff-Appellee,

v.

Patricia F. CLARK, a/k/a "Pat" and Mrs. John Clark, William Scott Martin, a/k/a David McCarthy, and John N. Satre, a/k/a John Sallatery, Defendants-Appellants.

No. 76–3575.

United States Court of Appeals,
Fifth Circuit.

Sept. 19, 1977.

Joseph S. Oteri, James W. Lawson, Martin G. Weinberg, Boston, Mass., David J. Fine, Cambridge, Mass., for defendants-appellants.

William T. Moore, Jr., R. Jackson B. Smith, Jr., U.S. Attys., Elizabeth C. Chalker, Augusta, Ga., Henry L. Whisenhunt, Jr., Asst. U.S. Attys., Savannah, Ga., for plaintiff-appellee.

Before GEWIN, RONEY and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

John Satre, William Martin and Patricia Clark appeal from judgments of conviction entered against them after a non-jury trial in the District Court for the Southern District of Georgia. Each was convicted of one count of conspiracy to possess, with intent to distribute, approximately 1,225 pounds of marijuana (hashish) in violation of 21 U.S.C. § 846. Defendants Satre and Martin were also convicted of one count of possession with intent to distribute marijuana (hashish) in violation of 21 U.S.C. § 841(a)(1).

All the issues raised focus upon the legality of a warrantless search of a pickup truck with an attached camper top (camper truck) and a subsequent search, pursuant to a warrant, of another automobile, a boat, and a dwelling. Specifically, the question for decision is whether or not the district judge committed error in denying the defendants' motions to suppress the contraband. We affirm.

This type of case must stand or fall on its particular facts. We examine the facts derived from the transcript and the findings of fact of the trial court. Almost all the facts are uncontested. Those that are contested are immaterial to the result we reach.

Our inquiry begins at a time two years prior to the challenged searches and seizures. At this early date, Jerry Minchew, the Park Superintendent of Crooked River State Park, Camden County, Georgia became suspicious of the activities of defendant Satre. Satre had been one of a number of individuals who had rented a cabin at the Crooked River State Park. During this earlier stay, he had purchased an expensive boat from a local resident and a few days later had left the boat with another local resident to sell "for what he could get out of it." Minchew testified that while he felt the boat was worth over $1,500, the boat was sold for only $600. Minchew speculated that Satre was involved in the trafficking of drugs.

Minchew remembered Satre when he and four other persons returned to the State Park on December 30, 1975. On this visit, the group rented two cabins from December 30, 1975, to January 10, 1976. Minchew testified that during this period he received complaints from other cabin occupants concerning the noise and late night activities of the group. Minchew's attention was directed towards the vehicles driven by the group. One car bore Idaho license plates; the other vehicles bore Florida tags. Minchew thought this to be suspicious since all the group except defendant Martin had stated that they were from Colorado. Martin stated he was from Boston, Massachusetts. Minchew testified that the Florida license tags did not bear an "E" signifying a rental vehicle.

On January 10, 1976, the group checked out of the cabins and left the park. Yet, on

the evening of January 11, 1976, the car bearing the Idaho license plates returned to the Park. Defendants Martin and Pascoe [1] were the occupants of the car. Martin told the Superintendent that he had driven about 50 miles down the road when he discovered that he had forgotten a piece of luggage for which he was returning. Minchew stated that he thought it strange that Martin had left the Park over 24 hours earlier yet stated that he had traveled only 50 miles. Martin retrieved the suitcase and departed.

On the evening of January 13, 1976, defendant Satre reappeared and asked if he could rent one of the cabins the group had previously occupied. When informed that the cabins were unavailable, Satre stated that "he would rather have one down in the bushes."

Before Satre departed for the secluded Cabin Number Six, Minchew observed water pouring from the stern of the boat being towed by Satre. Satre told Minchew that he had just returned from water skiing in Tampa, Florida. Minchew testified that his suspicions were aroused since it was "real cold weather" and it would be unusual for a boat to be dripping water after a 250 mile drive.

The critical facts which led to the seizure of the contraband occurred later on the evening of January 13, 1976. At approximately 10:00 p. m., Minchew drove by Cabin Number Six and observed that the car with the Idaho plates, the car that had returned for the forgotten luggage, had again returned to the Park. Minchew then contacted the Camden County Sheriff's Office and requested that an officer be dispatched to check into the activities of the occupants of Cabin Number Six.

At approximately 11:00 p. m., Officers Barber and Dudley arrived and ascertained the license numbers of the vehicles so that they could be checked for irregularities. Shortly thereafter, the three officers heard hammering noises in the area of the cabin. From a distance of 35–40 yards, they placed the cabin under surveillance. During this observation period, defendants Satre, Martin and Pascoe were observed building a wooden structure in the back of a camper pickup truck. Shortly after the structure was completed, the officers observed the defendants carrying various large plastic and burlap sacks. The defendants were removing these bags from the boat and loading them into the truck and the station wagon. The bags appeared to be quite heavy.

In conjunction with their visual observations, the officers overheard the defendants make the following comments:

Female Voice: "Bill, did the Park Superintendent see both of you?"

Female Voice: "Are you going to give them the best load now or wait and give them the best load later"?

Male Voice: "Did you get the shotgun? Be sure and get the gun, get the shotgun".

As a result of the above observations, Deputy Barber radioed Chief Deputy Kennedy of the Camden County Sheriff's Office for additional assistance. Officer Kennedy was enroute to the Park when the pickup truck, occupied by defendants Martin and Satre and containing the wooden structure and the large plastic and burlap bags, departed from the area of Cabin Six.

The officers relayed the events they had witnessed and their suspicions to Officer Kennedy. Officer Kennedy, who was enroute to the Park, was alerted that the pickup truck was proceeding in his direction and was requested to "check it out."

Kennedy spotted the truck coming out of the Park, turned around, and followed it for a distance of 2–3 miles. He testified that it appeared heavily loaded and was weaving. Having been advised to use caution because of the possibility that the occupants were armed, Kennedy radioed Officer Carter of the St. Mary's Police Department for assistance. After Officer Carter came into sight, Kennedy pulled over the truck.

1. Defendant Paula Lynn Pascoe is not a party to this appeal.

Martin, the driver, and Satre emerged from the truck. Officer Kennedy advised the defendants to keep their hands out of their pockets and asked Martin for his driver's license and the motor vehicle registration certificate. Officer Kennedy testified, and the District Court found that Martin produced a driver's license but no vehicle registration.

Kennedy then asked Martin if he could take a look in the truck. Martin replied, "Go Ahead." Kennedy shined his flashlight through a window of the truck. He observed on the floorboard of the vehicle a plastic bag containing a marijuana-like substance. He also testified that he smelled a strong odor of marijuana coming from the truck and that Martin appeared to be "stoned" or intoxicated on drugs.

Martin and Satre were placed under arrest and the truck was thoroughly searched. The search revealed that the wooden platform the defendants had constructed was designed to be a false bottom. Underneath the platform, the large burlap and plastic bags were found. Over 700 pounds of hashish was found in these bags.

Shortly after the arrest of Martin and Satre, Officer Barber appeared before a Camden County Justice of the Peace who, based upon the affidavit of Officer Barber, issued a search warrant for Cabin Number Six and the boat and station wagon, which had remained at the Park.

In executing the search warrant, over 500 pounds of hashish was found in the station wagon and a small quantity of the contraband, approximately 5–6 pounds, was found in the cabin.

Prior to trial, the trial judge held a hearing and after taking evidence, denied the motions to suppress.

With respect to the search of the camper pickup truck, the trial judge held the legality of the search had been established under two theories. First, the Court held that from the totality of the facts and circumstances, the officers had probable cause to stop and search the truck. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Alternatively, the Court held, assuming *arguendo*, that probable cause was lacking, the officers had a reasonable suspicion. Having such reasonable suspicion, the initial stop of the truck was lawful under the "investigative stop" theory. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Rollerson*, 491 F.2d 1209 (5th Cir. 1974); *United States v. Worthington*, 544 F.2d 1275 (5th Cir. 1977). While maintaining the status quo pending further investigation, Officer Kennedy then smelled the odor of marijuana and in plain view sighted a clear plastic bag containing a marijuana-like substance on the floorboard of the truck. The officer then possessed probable cause to search the truck. *United States v. Worthington, supra.*

In view of his findings, the trial judge considered it unnecessary to determine the validity of Martin's purported consent to search the truck and to determine the precise moment when the arrest of defendants Martin and Satre occurred. The trial judge also rejected numerous attacks on the legality of the subsequent search warrant and the search of the station wagon and the cabin.

On appeal, the defendants challenge each of the theories supporting the stop and search of the truck. First, they argue that probable cause was lacking and hence the automobile exception to the search warrant requirement does not apply. In attacking the investigative stop theory, the defendants argue that an arrest was made prior to the officer's plain view observation of the contraband and since probable cause to arrest was lacking, the seizure resulted from the exploitation of an illegal arrest.

In this case, while the search of the truck fits clearly within the investigative stop and the plain view theories, we go further and hold that prior to the initial stopping of the truck, probable cause was present.

■ It has often been held that probable cause to search an automobile exists when the facts and circumstances would lead a reasonably prudent man to believe that the vehicle contains contraband. *United States v. Worthington, supra; United States v. Nieto,* 510 F.2d 1118 (5th Cir. 1975); *Williams v. United States,* 404 F.2d 493 (5th Cir. 1968). In determining whether there was reasonable cause to believe the vehicle contained contraband, we look to the totality of the circumstances and the inferences that flow therefrom. *United States v. Olivares,* 496 F.2d 657 (5th Cir. 1974). While the defendants have stressed how innocuous and unsupportive of probable cause each fact is if taken alone, we do not view the evidence in that manner. As now Chief Justice Burger has stated, "[p]robable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total." *Smith v. United States,* 123 U.S.App.D.C. 202, 358 F.2d 833, 837 (1966). Viewing the evidence in this manner it may truly be said that the total may be a sum greater than its parts.

■ In addition to examining the totality of the circumstances, in view of the degree of communication between them, we look to the collective knowledge of the police officers, rather than the sole knowledge of Officer Kennedy, who performed the search of the truck. *Moreno-Vallejo v. United States,* 414 F.2d 901 (5th Cir. 1969).

We also take into account, the individual experience of the law enforcement officials. *United States v. Chapman,* 413 F.2d 440 (5th Cir. 1969). "Conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States v. Davis,* 147 U.S.App.D.C. 400, 458 F.2d 819 (1972). We think it clear from application of the above principles that the officers had probable cause to stop and search the truck.

■ Superintendent Minchew had ample cause to be suspicious of the activities of the group and to investigate these activities further. The return of the "Idaho car" on January 11 was unusual in view of Martin's explanation that he had only driven 50 miles away in a 24 hour period. The vehicle had then departed. Yet, two days later, on the night of January 13, it had again appeared within the Park. The later reappearance strongly cut across the grain of the representations made to Minchew that the group had departed from the area. The divergence between the residences of the defendants and the states in which the vehicles were registered was likewise suspicious since Minchew knew the cars bearing Florida license plates were not rented vehicles. Satre's specific request for a cabin in a secluded area along with his improbable story explaining the recent use of the boat clearly called for further investigation.

Surveillance was begun and the critical facts giving rise to probable cause were observed. At the outset, the officers knew that the defendants wished to avoid detection in carrying out their activities. They had specifically requested Minchew to rent them a cabin in a secluded area. They commenced their construction activities in the darkness of the night and at a late hour. The officers overheard one of the defendants express concern over being detected. The officers overheard one of the group make reference to a firearm.

The transfer of the heavy rubber and burlap bags from the boat, recently removed from the sea, to the truck and the station wagon narrowed the focus of suspicious clandestine, armed activity to that of drug trafficking. Officer Dudley testified that he had been employed in the Narcotics Division of the South Carolina Law Enforcement Division for six years prior to joining the Camden County Sheriff's Office. He testified that he had witnessed coastal drug smuggling operations similar to this one and had seen marijuana or hashish packaged and transported in the manner observed at the Park. The comments of the defendants in reference to the "best load" or "best shipment" gave audible support to the officers' visual observations.

Briefly summarizing, the unusual appearances of the group, their request for a secluded cabin, their desire to avoid detection, their unusual construction activities, the lateness of the hour, the removal of a large cargo from a boat recently pulled from the sea; the similarity of the packages to those which the officers in their extensive experience knew to be a common method of packaging and transporting hashish; the reference to a firearm for the protection of the defendants and their cargo; the comments concerning the "best shipment or load," and the concealment of the packages within the wooden structure fully supported a reasonable belief that drug trafficking was being observed. Thus from the totality of the circumstances, we hold that the District Court correctly determined that probable cause was present.

The defendants stress the fact that the officers at the Park allowed the truck to leave the cabin site, and only radioed to Kennedy to "check it [the truck] out." Defendants also argue that the actions of Officer Kennedy after stopping the truck only comport with a general license check. The inference compelled by the facts, they contend, is that the officers subjectively felt that probable cause to stop and search the truck was lacking. The defendants seem to argue that if probable cause had been present, the officers would have performed the search at the exact moment such cause arose.

In this case, we find scant support for the argument that the officers believed probable cause to have been absent. Yet, even if the officers felt that probable cause was lacking, an objective standard would still be applicable.

In *United States v. Resnick*, 455 F.2d 1127 (5th Cir. 1972) this Court held that even though a police officer believed that probable cause was lacking, the Court still had the duty to objectively determine if probable cause was present. This Court in finding that probable cause was present held that "the scope of the Fourth Amendment is not determined by the subjective conclusion of the law enforcement officer."

*United States v. Resnick, supra,* at 1132. Of course, police officers are not required to search or arrest at the exact moment probable cause arises. *See United States v. Lovasco,* —— U.S. ——, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), 21 Cr.L. 3102.

The remaining allegations of error raised by appellants center upon the issuance of the search warrant and the subsequent search of the station wagon and the cabin. The District Court rejected the contentions that the warrant was overbroad and insufficient to establish probable cause.

After the trial of this case and prior to oral argument in this Court, the Supreme Court decided the case of *Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (decided January 10, 1977). In *Connally,* the defendant challenged the Georgia fee system for the issuance of search warrants by justices of the peace. *Ga.Code Ann.* § 24–601 provided for a fee of $5.00 if a warrant was issued and no fee if the warrant application was refused. The Supreme Court held that the justice of the peace who issued the warrant was not "a neutral and detached magistrate," in view of his pecuniary interest in the warrant and further held "that the issuance of the search warrant by the justice of the peace in Connally's case effected a violation of the protections afforded him by the Fourth and Fourteenth Amendments of the United States Constitution." 429 U.S. at 251, 97 S.Ct. at 549.

On appeal, appellants argue that the holding in *Connally* applies to their case as well since the search warrant for the station wagon and dwelling was issued by a justice of the peace. The Government contends that *Connally* is to be applied on a case-by-case basis, determining in each instance whether or not the justice of the peace had the forbidden pecuniary interest in the issuance of the warrant. The Government has supplemented the record with an affidavit by the justice of the peace who issued the warrant which states that no fee was received. Neither party addresses the issue of the retroactive application of the *Connally* decision.

On the facts of this case, we reject the parties desire for us to expound upon the application of *Connally*. Rather, we pretermit decision on this issue and all other issues raised concerning the validity of the search warrant.

■ It is well established that evidence gained by a search conducted under authority of a defective search warrant may still be admissible if an exception to the warrant requirement is present. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In the instant case, there is no doubt that after searching the truck, the officers had probable cause of the highest degree to search the station wagon. They had personally observed the loading of similar burlap bags into the station wagon. Furthermore, it is clear that exigent circumstances were present due to the potential mobility of the vehicle. Thus, the well established automobile exception to the warrant requirement applies and no warrant was required to sustain the legality of the station wagon search in which over 550 pounds of hashish were found. *Carroll v. United States, supra; Chambers v. Maroney, supra.*

■ The search of the cabin under the authority of the warrant resulted in the seizure of 5–6 pounds of hashish, a minute amount in comparison with the approximately 1220 pounds legally seized. The evidence of the guilt of the defendants was overwhelming and there was a bench trial rather than a trial by jury. Thus, even if we assume *arguendo* that the search of the cabin was illegal because the warrant was defective due to a defective affidavit or because of the application of *Connally*, we conclude without hesitation that the error, if any, was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Having so held, we also need not determine whether defendant Clark had standing to urge the suppression of the contraband. A finding that she had standing,

would be of no avail to her since the evidence was legally obtained.

AFFIRMED.