**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Leslie WRIGHT, Jr.,
Defendant-Appellant.**

No. 78–5010.

United States Court of Appeals,
Fifth Circuit.

Jan. 22, 1979.

---

Robert R. Harris, El Paso, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy M. Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GEWIN, RONEY and GEE, Circuit Judges.

GEWIN, Circuit Judge:

William Leslie Wright was convicted in a non-jury trial by the district court of possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1972). On this appeal he contends that the warrantless search of his vehicle that produced the marijuana was illegal and in violation of his Fourth Amendment rights.

We find from the record that the search was founded on probable cause, and affirm.[1]

The search concluded over nine hours of continuous surveillance of appellant by United States Customs Patrol Officers. The surveillance began at 2:15 a. m. on August 31, 1977 when Customs Patrol Officers McGhee and Pallergy noticed a white pickup truck with a camper shell, driven by appellant, proceeding south toward Presidio, Texas on Highway 67.[2] The officers decided to follow the vehicle because many stolen pickup trucks cross the border into Mexico at Presidio. Appellant drove the truck to the Balia Inn in Presidio, where he parked next to a Cadillac in front of room 7 on the motel's southside. He entered room 7 and shortly thereafter left and made a call from a pay telephone on the northside of the motel. Pallergy and McGhee obtained the license plate numbers of the Cadillac and truck and drove to the Presidio port-of-entry where they learned that the Cadillac was registered to Bartholomew Dillon and the truck was listed in appellant's name. Dillon was suspected by Customs Officials of prior contraband smuggling but had no criminal record.

The officers returned to Balia Inn and continued surveillance. Around 4:00 a. m. a pickup truck driven by Jesse Carrasco was sighted traveling west on Highway 170 from the town of Redford toward Presidio. The officers learned that the vehicle was registered to Carrasco, a suspected narcotics dealer. Carrasco proceeded to the Balia Inn and parked adjacent to Dillon's Cadillac. He entered room 7, and minutes later departed, driving east on 170 toward Redford. McGhee and Pallergy commenced following the truck. Passing the inn, they noticed persons getting into the Cadillac and watched them proceed toward the port-of-entry. The officers notified port-of-entry officials of the vehicle.

McGhee and Pallergy followed Carrasco for about thirty minutes and then stopped and questioned him. He told the officers that he had just come from Mexico where he had been drinking beer. This story was at odds with the fact that other Customs Officials had observed Carrasco come from the opposite direction. McGhee and Pallergy allowed Carrasco to proceed and returned to the port-of-entry where they learned that Dillon and one Munoz had driven into Mexico in the Cadillac. The officers awaited Dillon's return and within an hour he crossed the border and proceeded directly to Balia Inn. The officers resumed surveillance at the motel and at 6:20 a. m. were notified that a Chevrolet Blazer with Mexican license plates had crossed the border into Texas and that the occupants were the Munoz brothers, one of whom had accompanied Dillon into Mexico. The automobile arrived at the inn minutes later and both occupants entered room 7. Officer McGhee recognized the Blazer as a vehicle he had seen driven by Carrasco on a previous occasion.

At 6:30 a. m. two men left the room, made a telephone call and returned. Within 30 minutes, five men left room 7; three persons got into the Cadillac, and two entered the Blazer. Both vehicles proceeded east toward Redford on Highway 170. Though the officer's suspicions were aroused by the activities, they remained at the motel while other Customs Officers followed the vehicles. Around 8:00 a. m. the Blazer returned to the inn and its three occupants entered room 7. One of the men was appellant, and McGhee and Pallergy believed another to be Carrasco.

---

1. In the suppression hearing below, the district court held the marijuana admissible as fruits of a lawful extended border search. Appellant argues in his brief that under *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1972), the warrantless search did not qualify as an extended border search. Since we have determined that the search was based on probable cause, we find it unnecessary to address and resolve this issue.

2. Highway 67 runs north from the Mexican border at Presidio into the interior of Texas. At Presidio it intersects Highway 170, which runs east-west, parallel to the Rio Grande River. The town of Redford is located on Highway 170, approximately 15 miles east of Presidio. Approximately 65 miles east of Presidio is the town of Study Butte, where Highway 170 intersects with Highway 118, which runs north.

Around 9:00 a. m. appellant and the other two men left the motel in appellant's truck and again proceeded toward Redford on Highway 170. McGhee and Pallergy followed the truck to Redford and set up surveillance at a point west of the town. Customs Officer Summers, in an unmarked car, established surveillance just east of Redford on Highway 170. Shortly thereafter Customs Officer Hiebert, in his private vehicle, drove through Redford attempting to find appellant's truck. Hiebert had been informed earlier of the sequence of events and the other officers' strong suspicions that a marijuana smuggling operation was in progress. Furthermore, all of the officers knew that Redford is a popular drug smuggling area, being located within 50 feet of the Rio Grande and having six to eight dirt roads leading to the river.

Initially unsuccessful in locating the truck, Hiebert finally sighted it, occupied only by appellant, traveling eastward out of Redford on Highway 170. Hiebert and Officer Summers proceeded to follow the truck which was traveling approximately 50 miles per hour. After some miles appellant stopped at the Teepees, a rest area popular for smuggling because of its location some 50 feet from the Rio Grande. The officers drove past appellant to prevent interruption of a possible pickup of contraband. Within minutes, appellant passed them on the highway. Hiebert made contact with appellant on his citizen's band radio to inform him that his turn indicator was blinking. Appellant then asked Hiebert whether the Rio Grande was unusually high for that time of the year and the officer responded that it was "normal." Hiebert asked appellant if he was going to Big Bend National Park, another area known for smuggling, and appellant answered "yes." Officer Hiebert and Summers decided by walkie-talkie to continue following appellant to the park.

Appellant increased the speed of his truck and upon arriving at the intersection of Highways 170 and 118, turned north on Highway 118 instead of turning east to go to the park. Suspecting that appellant had made the pickup of contraband and was leaving the area, the officers decided to apprehend him. Driving at speeds of over 100 miles per hour, Officer Summers stopped appellant after 27 miles of rapid pursuit. After arriving on the scene, Officer Hiebert looked through the window of the camper shell and noticed only a blanket and a pillow on a platform constructed of wooden boards. He testified at the suppression hearing that such contraptions are frequently employed to conceal contraband and a pickup with a camper top is a favorite means of transporting illegal drugs. After peering inside, he asked appellant what were the contents of the truck. Appellant replied that it contained "camping gear." Because he saw no camping gear, Officer Hiebert opened the right rear window of the camper to examine more closely its interior. Upon doing so, he smelled a strong odor of marijuana emanating from the camper. The officers then conducted a full search of the vehicle and discovered 837 pounds of marijuana concealed under the platform. Appellant was placed under arrest immediately.

■ Before we reach the question of the legality of the search, we must decide whether the stop of appellant's truck complied with Fourth Amendment principles. To justify the "restraint of movement" that a stop entails, an officer must be cognizant of circumstances giving rise to a reasonable suspicion that the person is engaged in a criminal enterprise. *United States v. George*, 567 F.2d 643, 645 (5th Cir. 1978), *citing United States v. Brignoni Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Villarreal*, 565 F.2d 932, 936–37 (5th Cir. 1978); *United States v. Worthington*, 544 F.2d 1275, 1279 (5th Cir. 1977); *United States v. Rias*, 524 F.2d 118, 121 (5th Cir. 1975).

■ Appellant's activities clearly furnished the officers grounds to reasonably suspect he was involved in trafficking of illegal drugs. His highly unusual activities in the early morning in Presidio and Redford, the repeated contacts with suspicious persons, the several border crossings and his contacts with those persons who had crossed

the border, his presence at various points along the Rio Grande, often used for smuggling, Carrasco's false explanation, appellant's inquiry about the river's depth, his false statement about his destination and finally, his acceleration to over 100 miles per hour in an apparent effort to leave the area and escape the officers, fully justified the pursuit and subsequent restraint. Certainly, Summers and Hiebert were warranted in seeking to further investigate and question appellant about the previous sequence of suspicious occurrences.[3]

■ Having decided the validity of the stop, we turn our attention to the search of the vehicle. There were present the exigent circumstances of the truck's mobility and appellant's attempted flight. Therefore, the legality of the warrantless search is to be determined solely by whether the officers had probable cause. It is settled law that probable cause to search a motor vehicle exists when the circumstances would cause a reasonably prudent person to believe that the vehicle contains contraband. *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977); *United States v. Nieto*, 510 F.2d 1118, 1119–20 (5th Cir. 1975). Moreover, where more than one customs

officer is involved, "probable cause is the [laminated] total of layers of information and the synthesis of what the police have heard, what they know, and what they observed," considered in light of the degree of communication between the officers and their individual experience. *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978); *United States v. Caraballo*, 571 F.2d 975, 977 (5th Cir. 1978); *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977), cert. den., 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1978). As we stated in *Clark*, "Viewing the evidence in this manner it may truly be said that the total may be a sum greater than its parts." *Id.*

■ The collective knowledge possessed by the Customs Officers before the stop combined with those circumstances learned after the stop, *e. g.*, appellant's false representation as to the truck's contents, the platform recognized by Hiebert as a popular concealment device, strongly indicated the presence of contraband in the camper. Given these facts we are convinced that the officers had probable cause to make the slight intrusion on privacy interests embodied in the opening of the camper's rear window.[4] Once the window

3. It has long been recognized that a stop, when founded on the proper quantum of evidence, may be utilized to investigate suspected criminal activity. As we stated in *United States v. Worthington*, 544 F.2d 1275, 1279 (1977):

[T]he courts have recognized the right of police officers to stop and detain an individual . . . with less than probable cause . . . . It is the legitimate function of law enforcement agents to detect and prevent crime . . . . It is their duty to be alert for suspicious activities and to follow up with appropriate investigation within constitutional limits. . . .

4. The Supreme Court has repeatedly emphasized that the Fourth Amendment affords motor vehicles somewhat less protection than that provided other property. *See Rakas v. Illinois*, —— U.S. ——, ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538, 549 (1977); *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116, 1130–31 (1976); *Cardwell v. Lewis*, 417 U.S. 583, 589–91, 94 S.Ct. 2464, 2468–2470, 41 L.Ed.2d 325, 334–35 (1974). *See also United States v. Johnson*, 431 F.2d 441 (5th Cir. 1970)

(En Banc), *aff'g* 413 F.2d 1396 (5th Cir. 1969). The fundamental basis for this dichotomy is the "diminished expectation of privacy" possessed by an occupant of a motor vehicle.

"One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view. (citations omitted) 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' . . . ."

*Cardwell supra*, 417 U.S. at 590–91, 94 S.Ct. at 2469. We wish to stress, however, that this reduced expectation relates to the threshold issue of the Fourth Amendment's applicability. It does not affect the time-honored rule that when an occupant of a motor vehicle has a reasonable expectation of privacy in the vehicle's interior, a warrantless search of the vehicle must be supported by probable cause. *Almeida-Sanchez v. United States*, 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596, 600–01 (1973); *Chambers v. Maroney*, 399 U.S. 42,

was opened and the smell of marijuana emanated from the vehicle's interior, there was ample probable cause to make a full and complete search of the truck. The ensuing discovery of the 837 pounds of marijuana furnished the probable cause necessary for appellant's warrantless arrest. *See United States v. Williams*, 573 F.2d 348, 350 (5th Cir. 1978), *citing United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

Judgment AFFIRMED.

48–51, 90 S.Ct. 1975, 1979–1981, 26 L.Ed.2d 419, 426–28 (1970), *reh. den.*, 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94; *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543, 552 (1924). *See Texas v. White*, 423 U.S. 67, 68, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975).