**UNITED STATES of America, Plaintiff,**

v.

**Paul BLOCK et al., Defendants.**

**Crim. A. No. 79–302–C.**

United States District Court,
D. Massachusetts.

Feb. 6, 1980.

---

Edward F. Harrington, U.S. Atty., Walter Prince, Asst. U.S. Atty., Boston, Mass. for plaintiff.

Richard W. Barry, Barry, Killion & Masterson, Quincy, Mass., for defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

Defendant Paul Block was charged in a four Count indictment returned July 26, 1979 with the following violations of federal narcotics laws.

Count I charged that from on or about March 1, 1979 to on or about July 15, 1979 in the town of Wellfleet, Massachusetts and elsewhere Block and five others knowingly, willfully and intentionally conspired to violate 21 U.S.C. § 846, i. e., possessing marijuana with intent to distribute it.

Count II charged that on or about July 15, 1979 in Wellfleet and elsewhere, Paul Block knowingly and intentionally possessed, with intent to distribute, a quantity of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count III alleged that from on or about March 1, 1979 to on or about July 15, 1979 at Wellfleet and elsewhere Block and one other knowingly, willfully and intentionally conspired to violate 21 U.S.C. § 963, i. e., import marijuana into the United States and the District of Massachusetts from a place outside thereof.

Count IV charged that from on or about March 1, 1979 to on or about July 15, 1979 at Wellfleet, Paul Block unlawfully imported into the United States, to wit, into the District of Massachusetts, from a place outside thereof, a quantity of marijuana, in violation of 21 U.S.C. § 952(a) and § 963 and 18 U.S.C. § 2.

Defendant Block's motions sought the suppression of evidence seized in the search of: .

(1) a cottage known as Must House located on Blackfish Creek in Wellfleet, Massachusetts;

(2) a motor vehicle rented by a co-defendant from Hanover Dodge which was parked at the above-named cottage;

(3) a green GMC pickup truck, with camper attached, registered to Block; and

(4) a boat known as the "Shango", a 50' custom anstey yacht owned by Block.

Block also moved to suppress any statements oral or written made by him to agents of the Commonwealth or of the federal government. The parties have stipulated that all searches were warrantless.

On November 13, 1979 after an evidentiary hearing defendant's motions to suppress were denied and the defendant's renewed motion to suppress was denied on January 8, 1980. The denial of Block's motions to suppress was based on the following findings of fact.

## STANDING

It is clear at the outset that Block has no standing to object to the search of either the Must House or the vehicle rented by his co-defendant since I find that he had no expectation of privacy in either the cottage or the car. "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978) *quoting Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). The search of a third person's premises or property therefore may not be raised by defendant Block.

The defendant however does have standing to assert a Fourth Amendment claim as to the remaining three categories of evidence.

On the morning of Saturday, July 14, 1979 the McKays reported to Sgt. Brooks of the Wellfleet Police that they had heard motor boats in Blackfish Creek between 2:30 and 4:30 a. m. The McKay residence is located on a dirt road off Cannon Hill Road in Wellfleet near Blackfish Creek and next to a cottage known as Must House. Sgt. Brooks went to the McKay home at 1:05 that afternoon and spoke to both Mr. and Mrs. McKay who told him that they had also heard splashing and a sound which sounded like an anchor dropping in Blackfish Creek in front of Must House between 2:30 and 4:30 a. m. The McKays also told him that there had been three vehicles in the yard of Must House.

Sgt. Brooks and Wellfleet Police officer Brintnall went to the Must House area and walked around. Sgt. Brooks testified and I find that although the grass in an inlet behind the house was matted down, no boats were visible. I further find that they returned to the police station where Sgt. Brooks posted a card on the bulletin board. The card informed the Wellfleet police officers of the McKay complaint and notified them that the McKay's would be calling if they again heard similar noises.

At approximately 4:19 a. m. on July 15, 1979 Officer Parker was directed to investigate a call from the McKay residence. The content of the communication was "McKay residence. Same thing." As a result of that communication Officer Parker together with Officers Palmer and Lewis drove down Cannon Hill Road past the McKay residence, and past the Must House and proceeded to Freedman's Point in the Blackfish Creek area. Officer Parker testified and I find that despite the darkness and fog he was able to make out a two-masted sailboat which was 100 to 120 feet off shore.[1] I further find that he could see that the boat was white, 25–30 feet long, and that five to seven males were unloading something from the boat into a smaller

---

1. Officer Parker testified that photographs of the Yacht Shango were photographs of the two-masted sailboat which he had observed that morning.

boat.[2] He did not recognize any of the men. He heard voices, and shuffling noises as if whatever was being moved was covered with paper or plastic. He also heard thuds as if it was being dropped. He then saw the smaller boat depart and head in the direction of Must House.

At 4:31 a. m. July 15, 1979 Sgt. Brooks received a call at home which informed him that the McKays had called again and that Officer Parker had requested his presence. The Sgt. met Officer Parker at Route 6 with Officers Lewis and Palmer. Officer Parker reported to Sgt. Brooks the observations which had been made at Freedman's Point. I find that the four officers then proceeded to Old Wharf Road and that from Old Wharf Road Officer Parker observed the same smaller boat heading into the Creek and moving toward Wellfleet Harbor and away from the direction of Must House. The boat was riding lighter on the water with no cargo visible.

The Officers then proceeded to Must House in two cars. Officer Palmer rode with Officer Parker and Officer Lewis rode with Sgt. Brooks. They arrived there at approximately 5:13 a. m.

Officer Parker, as he walked down the driveway, was ahead of the other officers. He saw a man exit the Must house. The man, upon seeing Officer Parker (who was uniformed) ran between a green GMC pick-up truck with a camper top parked next to the house and the house itself. A woman also came down the steps of the porch. She ran toward a red Toyota pick-up truck. Officer Parker detained her while Officer Palmer pursued the man.

Sgt. Brooks did not see the man and woman exit the house but he heard Parker say that a man had run to the rear of the green GMC pick-up truck. I find that the Sergeant ran behind the truck and opened it to see if the subject had hidden in it. Instead he found wrapped plastic bundles and some residue which appeared to be

marijuana. After advising Officer Parker that the truck was "full of grass" he went to help Officers Palmer and Lewis who were pursuing the male subject. At that point Officer Parker placed the woman under arrest, handcuffed her to the Toyota and participated in the pursuit of the man.

Block argues that his constitutional right to be free from unwarranted searches and seizures was violated when Sgt. Brooks opened the back of his camper.

I find that Sgt. Brooks' reason for opening the back of the camper was to find out if anyone was concealing himself therein and that no search of the van occurred beyond opening the door and looking inside. Thus the issues which the Court need determine are (1) whether the police had probable cause to arrest the man that they were pursuing and (2) whether the exigencies of the situation were such as to justify bypassing the warrant requirement.

When the four police officers approached Must House in the early morning hours of July 15, 1979 they were aware of two separate reports of unusual activity in Blackfish Creek in the area of Must House, at a highly suspicious hour of the night. They knew that Must House had direct access to the Creek and that the grass at the creeks edge behind Must House was matted down as if boats had been landing there. They were aware that several camper type vehicles had been parked around Must House. They had seen a sailboat offloading into a smaller boat in the Creek and saw the smaller boat head in the direction of Must House. Later they had seen the same boat return from that direction after apparently having unloaded its cargo. Given the fact that boating activity of any kind in Blackfish Creek was highly unusual, I find that the officers were justified in investigating further.

I rule, moreover, that the events leading up to the pursuit of the male subject must be considered in light of the collective expe-

---

2. Officer Palmer also witnessed the offloading of the vessel. Officer Lewis was unable to see anything. He did however hear someone say "We are stuck. Let's get the hell out of here."

Officer Palmer heard someone say "Hurry up. Get a line on it and we can pull it off." He also heard the sound of a boat being paddled.

rience of the four officers. "Probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total." *United States v. Clark*, 559 F.2d 420, 424 (5th Cir.), *cert. denied* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 301 (1977) *quoting Smith v. United States*, 123 U.S.App.D.C. 202, 206, 358 F.2d 833, 837 (D.C.Cir. 1966) *cert. denied* 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967). "Viewing the evidence in this manner it may truly be said that the total may be a sum greater than its parts." *United States v. Clark, supra* at 424.

After considering all of the foregoing together with the fact that the male subject observed exiting the house fled upon seeing a uniformed officer, I rule that the police had probable cause to believe that a crime had been or was being committed and to pursue and arrest the fleeing subject.

■ When Sgt. Brooks opened the camper, therefore, he was attempting to prevent the escape of a suspected felon. Although he had not seen the man run between the camper and Must House, he had been informed by a fellow officer that the subject had run to the rear of the camper. It was reasonable therefore for him to assume that the man might have hidden inside the camper. Given the fact that Sgt. Brooks was in "hot pursuit" there was no time to obtain a warrant and thus there were sufficiently exigent circumstances to justify the opening of the camper without a warrant. I rule therefore that no constitutional violation occurred at that time.

### THE SEARCH OF THE SHANGO

Officer Brintnall was contacted by the Wellfleet dispatcher at 5:00 a. m. and directed to pick up a boat and go out to Blackfish Creek to look for a two-masted sailboat. He went to the police station and then to the pier at Wellfleet Harbor and proceeded toward Blackfish Creek with Officers Chapman and Dath in a boat which belonged to Officer Chapman's father-in-law. Over the radio Officer Parker describ-

ed the sailboat to him. At some point during the trip Brintnall received a radio communication that two trucks filled with marijuana had been found on shore by other police officers.

At approximately 5:21 a. m. Officer Brintnall saw the sailboat Shango. He also saw that there were two smaller boats in the vicinity of the sailboat and that they were headed toward the shore. One of the smaller boats was a Boston Whaler carrying two men. The whaler was towing behind it an inflatable raft also carrying two men. Officer Brintnall testified and I find that when the two boats reached the shore, all four men were directed by the police officers to stop. Three of the men ran away and one remained. The man who obeyed the command of the Officers was Paul Block.

I find that Officer Brintnall remained with Block while Officers Chapman and Dath pursued the other three men. Officer Brintnall observed a brown leafy substance which he believed to be marijuana all over the raft and the Boston Whaler. He placed Block under arrest. At approximately 6:00 a. m. Officers Brintnall and Chapman went out to the Shango to make sure that there were no other suspects on board. As they approached the vessel they could see that the boat was aground in four to five feet of water.

Upon nearing and boarding the vessel the officers saw a brown leafy substance on the decks and the hatchway. At that point they began to search for suspects and marijuana as well. Officer Chapman opened the hatch and saw the same leafy substance below. Officer Chapman then went below where he found no suspects but did find eight bales of marijuana in the front part of the boat.

■ Defendant Block seeks suppression of the evidence seized in the search of the Shango arguing that the warrantless search was violative of the Fourth Amendment. I rule that the search of the Shango was constitutionally valid because it was within the automobile exception" outlined by the

Supreme Court in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

I find that when Officers Chapman and Brintnall went out to the Shango at 6:00 a. m. on July 15, 1979 they intended only to make a brief inspection in order to insure that no one had remained on board. It was not until they observed the brown leafy substance on the deck that they started to search for marijuana as well. I rule not only that a brief search for the limited purpose of determining whether anyone remained on board clearly was justified under the circumstances but also that the search would have been permissible even if the officers had initially only intended to search the vessel for contraband.

I find that when the two officers set out for the Shango they were aware that police on shore had seized two trucks filled with marijuana. They knew that a connection was believed to exist between the contraband seized and the two-masted sailboat which had been observed in Blackfish Creek earlier that morning. Furthermore the Shango matched the description given to them by an officer who had observed that two-masted sailboat and, since any boating activity in Blackfish Creek was unusual, it was highly unlikely that two such boats would be in the Creek at the same time. In addition, three of the four men whom they had first seen in the vicinity of the Shango had fled when approached by police and the boats in which those men had been travelling were covered with a substance which the officers believed to be marijuana. I rule that there was probable cause for the officers to believe that the Shango was being used to traffic drugs illegally even before the officers saw the brown leafy substance on the deck of the Shango and therefore that if the circumstances were sufficiently exigent they were free to conduct a warrantless search.

"A boat, like an automobile, carries with it a lesser expectation of privacy than a home or an office." *United States v. Miller,* 589 F.2d 1117 (1st Cir. 1978), *cert. denied* 400 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *Chambers v. Maroney, supra; Carroll v. United States, supra.* In addition circumstances which give rise to probable cause in cases involving vehicles are more likely to be unforeseeable. For those reasons and because of their ready mobility, less stringent warrant requirements have been applied by the courts in cases which involve automobiles and boats. *Chambers v. Maroney, supra; Carroll v. United States, supra; United States v. Miller, supra.*

In *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) the Supreme Court held that the search of the exterior of a car without a warrant was not unreasonable even when police had impounded the vehicle before the search and thus removed any risk of the evidence disappearing. That principle was applied to a search of the inside of a car by the Court of Appeals for the First Circuit in *Haefeli v. Chernoff,* 526 F.2d 1314 (1975). In that case there was no reason to believe that the evidence would be removed.

In the case at bar although the Shango was aground, it was within the realm of possibility that it could be pulled off the sandbar and moved before high tide. This would be especially true if anyone had remained on the boat.[3] In addition it had become clear by 6:00 a. m. that quite a number of persons were involved in the enterprise. The police could not therefore be certain that any evidence which might be on the Shango would not be removed before a warrant was issued. The circumstances of this case would therefore appear more "exigent" than those presented in either *Cardwell v. Lewis, supra* or *Haefeli v. Chernoff, supra.*

---

**3.** The fact that four men appeared to have departed from the Shango did not preclude the conclusion that someone had remained on board. Indeed, although Officers Chapman and Brintnall were apparently unaware of it, five to seven persons had been seen on the boat earlier that morning.

**1302**

Consequently I rule that the search of the Shango was constitutionally valid and for that reason defendant's motion to suppress evidence discovered in that search was denied.

## STATEMENTS MADE BY DEFENDANT BLOCK

As discussed above, at the time that Officers Dath and Chapman set out in pursuit of the three male suspects on the beach, Officer Brintnall remained behind with Mr. Block. While Officer Brintnall was still in the bow of the police boat as it coasted toward the shore he heard a transmission on the police radio warning him to "be careful of guns." I find that the transmission was audible within ten to fifteen feet of the radio, that Block heard it and that upon hearing it Block stated to Brintnall that there were no guns. I further find that upon reaching the beach Officer Brintnall examined the raft and the Whaler and then placed Block under arrest. At that point he asked Block what his name was. He did not give Block the *Miranda* warnings. Although Brintnall asked no further questions, Block volunteered two further unsolicited comments. He asked Officer Brintnall how the police had caught them and what kind of police they were. Both remarks were made within 90 seconds of the arrest.

The decision of the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) requires only that the *Miranda* rights be given before any interrogation occurs. Officer Brintnall did not conduct any questioning of defendant Block. Given the voluntary nature of the remarks and the brevity of time span between the arrest and the statements, I rule therefore that the unsolicited statements made by Block to Officer Brintnall were admissible as evidence against the defendant.

In light of the foregoing therefore the defendant's motions to suppress were denied.